# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0898-18T2

J.L.,

     Plaintiff-Respondent,

v.

J.J.L.,

     Defendant-Appellant.

_____

Submitted January 6, 2020 – Decided January 31, 2020

Before Judges Geiger and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-0599-18.

John William Hartmann, attorney for appellant.

Pellettieri Rabstein & Altman, attorneys for respondent (Lydia Fabbro Keephart, on the brief).

PER CURIAM

Defendant J.J.L.[1] appeals from a final restraining order (FRO) granted to plaintiff J.L. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. He argues that there was insufficient evidence to support the trial judge's findings of harassment or that plaintiff was in need of a FRO. Further, defendant maintains that because the trial judge improperly issued a FRO, his subsequent July 20, 2018 decision awarding attorneys' fees to plaintiff should be reversed. We disagree with defendant's contentions and affirm.

I.

The record from the FRO proceeding established the following facts. Defendant, an automobile salesman and former law enforcement officer, resides in West Windsor. Defendant's wife passed away from cancer when their daughters, plaintiff and J.L. (Jaclyn), were children. When plaintiff began college, she moved out of defendant's home with the exception of occasional periods during school breaks. After graduation, she began full-time employment as an elementary school teacher while undertaking graduate studies.

---

[1] We employ initials and pseudonyms to protect the privacy of the parties. R. 1:38-3(d)(10).

A-0898-18T2

Plaintiff testified that she serves as the primary caregiver for L.L. (Laura), her ninety-six-year-old paternal grandmother. Plaintiff stated she "spend[s] a lot of time" at Laura's house, "take[s] her to all of her doctor's appointments," goes grocery shopping, and "look[s] out for her well-being . . . ." Laura, according to plaintiff, "wants no relationship" with defendant.

Plaintiff last saw defendant in April 2017 after an incident at a restaurant also involving plaintiff's close friend M.C. (Mary). On that occasion, plaintiff noted that defendant "was drinking as usual" and asked for the whereabouts of Jaclyn. According to plaintiff, defendant and Jaclyn "[had] not spoken in four years, and [also] want[ed] no relationship with him."

Defendant also began "making inappropriate comments . . . about [their] sexuality," noting that "even [if they] were lesbians [they] wouldn't tell him." As a result, plaintiff felt "[v]ery uncomfortable" and characterized the conversation as "an interrogation" because defendant "kept asking the same things[,] [a]nd he had this edge to him" throughout. Mary testified that during dinner, defendant referred to her and plaintiff as "a couple of carpet munchers."

Shortly thereafter, on Easter, plaintiff contacted defendant, but he did not answer his phone. That evening, defendant called back and left a voicemail for plaintiff detailing how he "almost killed" a motorcyclist the previous day, "tried

to turn him into a freaking hood ornament," and attempted to "pull him off [the motorcycle] to break his neck and f--king kill him." Defendant also informed plaintiff that he "got in a fight at work with [his] boss" and that it "suck[ed]" celebrating Easter alone.

The following weekend, defendant left another voicemail expounding upon the encounter with the motorcyclist, among other topics. He explained that he tried to "run [the motorcyclist] into a telephone pole and kill him," and that when the motorcyclist gave him the middle finger, he left the vehicle "to go pull him off his motorcycle [and] take that finger off his hand." Given the nature of these voicemails and their temporal proximity to one another, plaintiff "was uncomfortable and unnerved because . . . [defendant] was . . . interrogating when [she] had seen him last. This aggression had come out. He had been drinking more. And now he [was] threatening to kill people."

In defendant's next voicemail, on April 29, 2017, he stated that he "body-slammed a jerk off at work," a comment he characterized as a joke at trial, and claimed to be "on sick leave." Further, he told plaintiff not to "bother coming by to see" him, and to "[j]ust leave [him] alone." Defendant then ended the voicemail by saying "[l]ove you. Miss you. Wish you were still here. F--k it. I'm pissed." Unlike the previous two voicemails, plaintiff did not return that

4

call because she "didn't want to be around [defendant] when he [was] being violent . . . and can't control himself in the workplace," and due to his prior voicemail regarding "problems on the road."

The following week, on May 6, 2017, defendant left another voicemail informing plaintiff that he was moving and that he wanted plaintiff and Jaclyn to "come over and clean all [their] stuff out of [the] house," insisting that they both contact him to "make appointments to go over and get [their] stuff." He stated that he was "getting rid of everything in [the] house[,] . . . selling it[,] [a]nd . . . moving." The next day, defendant called again, asking in another voicemail whether plaintiff received his previous message and whether he was "worthy of a call back."

According to plaintiff, the last time she spoke to defendant was May 7, 2017, when she returned the May 6, 2017 call. Plaintiff stated defendant told her she doesn't "do enough for him," and that she and Jaclyn "weren't seeing him enough" or "doing enough," despite that she was taking care of her then ninety-five-year-old grandmother. Defendant also asked if plaintiff knew he had

cancer,[2] and stated "[h]e would let [plaintiff] know" whether he was going to move.

Following that conversation, plaintiff stopped answering defendant's calls. On Father's Day 2017, plaintiff returned defendant's car to his home, but did not speak to him because she "had such unpleasant interactions with him . . . [a]nd [she] was scared" to visit defendant's house alone.

The following day, on Monday, June 19, 2017, defendant left numerous voicemails for plaintiff, often in rapid succession. Specifically, defendant left seven voicemails while plaintiff was at work and later at a colleague's retirement party. Defendant testified that he made these calls with the purpose of having plaintiff and Jaclyn remove belongings from his home.

In the voicemails, however, he included extraneous content including a reference to himself as plaintiff's "ex-father" and that she no longer had a father because she did not "call [him] on Father's Day." He also stated he no longer had daughters and that plaintiff and Jaclyn were "scumbags." Further, defendant said "f--k you" to plaintiff, referred to her as a "stinking piece of garbage," and called Jaclyn plaintiff's "dusty ass sister . . . ." Moreover, he stated that if

---

[2] Plaintiff testified at trial that she did not know whether defendant did, in fact, have cancer.

A-0898-18T2

plaintiff did not remove her belongings from his house, "all the pictures of [her] mother" and all of her childhood possessions would be in a dumpster or at "the garbage dump." He also told plaintiff that he changed the locks so that she could not enter the house. That evening, defendant informed plaintiff that he was "going the dumpster route," that he hoped he didn't break one of plaintiff's childhood possessions by throwing it in the dumpster and told her to "[h]ave a nice life."

As a result of those voicemails, plaintiff testified that she was "[v]ery upset" and had to leave her colleague's retirement party because she "was scared to leave [her] grandmother alone," and that she was worried "about . . . what [defendant] was going to do next."

One week later, defendant left three more voicemails, again seeking a location to send plaintiff's and Jaclyn's belongings. These voicemails contained similar content to those the previous week, including that he "changed the locks," that if they did not contact him, their possessions, including "pictures of [plaintiff] and her mother" would "be in the dumpster," and, again, called Jaclyn plaintiff's "dusty-ass sister." He noted that he was "not playing any f--king games," but called again an hour later stating that he was "trying to do the right

A-0898-18T2

thing" and that he did not want to throw out pictures of plaintiff and her mother. Plaintiff testified that she was "crying" as a result of the voicemails.

The following day, around 9:30 p.m., defendant called again, leaving a message stating that he knew plaintiff didn't "give a s--t" about him, but that he was "number [one] out of [seventeen] dealerships selling Fords," and that he was "pretty f--king good."

On July 31, 2017 defendant left three more voicemails relating to his personal issues with plaintiff. He instructed plaintiff to "[r]ip [her] will up and tell [Jaclyn] to rip it up too," that they no longer would have his home, and that they were "done." Two minutes later, he called again and informed plaintiff that he was donating his entire estate in memory of plaintiff's mother, and that he "never want[ed] to see" his daughters again. Later, he told plaintiff that as part of cleaning the house, he was "burning everything there is, all the pictures, everything in the world," and if plaintiff wanted her possessions, to call him. Otherwise, with regard to one of plaintiff's childhood possessions with apparent sentimental value, defendant stated he was "going to smash it and throw it in the freaking recycling bin."

Plaintiff stated that as a result of these messages, she "start[ed] panicking and [got] upset." Specifically, she stated that any time she saw defendant's

8 <span>A-0898-18T2</span>

"phone number or [received] a voicemail," she became anxious about "what he [was] going to say [and] . . . do," and she became "very upset." Further, she testified that she was happy about a potential donation of his estate, but that she was "tired of him calling" her, and that whenever defendant attempted to contact her, it caused her to "feel sick the rest of the day." Plaintiff also expressed fear regarding defendant's "violent nature," "aggression," and angry tone.

After nearly three months without a phone call, on October 24, 2017 defendant left three more voicemails. That morning, while plaintiff was teaching, he let her know that he could not locate Laura and asked whether plaintiff knew "anything about what [was] going on." Two hours later, defendant left another voicemail in which he told plaintiff he had been at her school and again asked for the whereabouts and condition of Laura. Finally, that night around 11:00 p.m., defendant left a message stating he would "have the police go [to Laura's home] and do a wellness check" if plaintiff did not return his call.

Plaintiff testified at trial that she was "very fearful" that morning because defendant "show[ed] up at [her] job" while she was teaching. She expressed confusion as to why defendant would "all of a sudden" ask about Laura. She also felt concerned, thinking "oh my god, he's going to [Laura's] house" while

9

plaintiff was at work. She was also fearful because when defendant had gone to Laura's home in the past, she had suffered from high blood pressure for which she has "had to seek treatment . . . ." Plaintiff further noted that her principal spoke to her about defendant's visit, causing her to worry about her job.

Five days later, defendant again called and stated that he could not reach Laura, and that he was going to the Princeton Police Department the following morning to have an officer "check Grandma's house." After that, defendant said, he and the police would "come to [plaintiff's] school and interview" her. He asked plaintiff whether she "want[ed] the police at [her] school" and told her to contact him. Following this message, because defendant was "not dropping it," had previously come to her school, "[a]nd was threatening to come back again with police," plaintiff contacted the police herself and shared the voice messages with the officers.

While plaintiff was at the police station, defendant left another message, reiterating his intent to have the Princeton Police Department perform a wellness check on Laura and then interview plaintiff the following morning. He again asked if plaintiff wanted her "childhood possessions" and "pictures of [plaintiff] and [her] mother" in a dumpster and stated that he was "not playing games."

A-0898-18T2

The following day, October 30, 2017, defendant left two voicemails, informing plaintiff that he had been to Laura's house and that he did not "know what [was] going on over there." Further, he noted that he had spoken to a police officer who had been at plaintiff's school for a drill, and that the police were going to perform a wellness check on Laura. Because plaintiff was driving Laura's car, defendant stated, he would have the police interview her as well. He asked plaintiff to explain the situation "or the police [were] going to be involved." He also informed plaintiff that he was "leaving town."

Plaintiff testified that she was "very upset" by the October 30, 2017 messages. Specifically, she noted that she was upset by defendant's visit to Laura's house because he was "clearly walking around the house," concerned that he returned to plaintiff's school to observe Laura's car, and troubled that he was "using" an officer who had been at plaintiff's school to "find[] out information about [her] from other people." In part because one of defendant's voicemails did not include care for Laura and only concerned a check he had sent to plaintiff to satisfy a debt, plaintiff stated she felt the October 30, 2017 messages "were just another way to get to [her] and to get to [her] school [and] that they weren't actually about" Laura.

A-0898-18T2

On November 2, 2017, plaintiff filed a complaint in support of a temporary restraining order (TRO), relying on the October 2017 incidents. Plaintiff also discussed the June and July 2017 phone calls, as well as defendant being "physically abusive to . . . [plaintiff] and [Jaclyn] when they were younger," causing them to "live[] with [Laura] for a year and a half at one point," when describing the history of domestic violence between the parties.

That day, after hearing plaintiff's testimony regarding her relationship with defendant, the domestic violence hearing officer recommended the issuance of a TRO. In making the recommendation, the hearing officer determined that defendant had harassed plaintiff in violation of N.J.S.A. 2C:33-4 by coming to her school the previous week, and that he had stalked her in violation of N.J.S.A. 2C:12-10.1 by visiting Laura's home and plaintiff's school unannounced.

Beginning on February 20, 2018, and concluding on April 16, 2018, Judge Joseph A. Hughes conducted a trial with respect to plaintiff's request for a FRO. He considered testimony from plaintiff; Mary; E.N. (Ella), a longtime friend of plaintiff; J.P. (Jeffrey), a longtime friend of defendant; and defendant, as well as documentary evidence and the voicemails left on plaintiff's cell phone by defendant.

12

Judge Hughes first heard testimony from plaintiff who, in addition to describing the factual scenario giving rise to her complaint, testified regarding the familial relationship between herself, defendant, Jaclyn, and Laura. She maintained that prior to the above incidents, defendant would "get very aggressive . . . and start screaming" if she did not visit him on holidays. Because she was "scared of . . . what he would do to [Laura] and [Jaclyn]" if she did not visit, she "maintained a relationship for all of those years to keep him away from" her sister and grandmother, and that she was always accompanied by Mary so that she "wasn't going over there alone."

Defendant also testified. Regarding Laura, he stated that he had most recently contacted her on Christmas 2016 and then in June 2017, when he told her about an award he had won at work. He later contacted Laura in October 2017 to tell her about another award and became concerned when she did not answer the phone. When he went to check on her, he stated that the garage had no vehicle inside it and "the whole house looked like . . . no one lived there." As a result, he called plaintiff asking about Laura's condition, and when he did not receive an answer, he went to plaintiff's school, spoke to the principal, and asked her to have plaintiff call him.

13

When plaintiff and Jaclyn did not return his calls for a few days, he testified that he again went to Laura's house to check on her, finding the car missing and "the window in the garage . . . blocked." According to defendant, this prompted his first message stating he would have the police perform a wellness check. He further testified that once he was served with the TRO, he cancelled the wellness check and stopped attempting to contact plaintiff. He also stated that had he been notified that Laura was well, he "certainly wouldn't have made any more phone calls" or gone to plaintiff's school.

Defendant further testified regarding his conduct with respect to plaintiff. He stated that he was looking to sell his home but could not because plaintiff's and Jaclyn's possessions were making it "very messy." While he acknowledged that his messages to plaintiff were not "nice" or "pleasant" and that he "wish[ed] [he] had not made those messages," he stated that he never followed through on discarding their belongings because he "love[s] them, and [did not] want to throw their stuff away." He described being "hurt," "very upset," and "trapped . . . with a house full of memories . . . ." He also denied asking plaintiff and Mary whether they were lesbians and calling them "carpet munchers." Defendant further stated that he never threatened or harmed plaintiff.

Ella and Mary, according to Judge Hughes, "corroborated some of the plaintiff's testimony," including the strained relationship between plaintiff and defendant, defendant's temperament, and his apparent lack of concern for Laura prior to October 2017. Specifically, Mary characterized going to defendant's house as "walking into a landmine." Regarding Laura, Ella noted that defendant had called her a "fat-ass" and suggested that she "go play in traffic." On the other hand, Jeffrey "corroborated some of the defendant's testimony that he was inquiring about the welfare of his mother . . . ."

On May 1, 2018, Judge Hughes issued a comprehensive and thoughtful oral decision and corresponding FRO. In support of his ruling, he found that plaintiff's testimony was "direct," "detailed," "genuine," "candid," and corroborated by other evidence such as the voicemails. In considering the "two different versions" of the underlying events, the judge found the voicemails to be "instructive." Specifically, he noted that some calls contained "irrelevant content . . . with . . . offensive or coarse language and not pertaining to the purported subject of the call," which undermined defendant's argument that he was "simply a worried son."

Further, Judge Hughes noted that some calls "appeared to have been made for no apparent [legitimate] purpose" and contained "some pretty violent

imagery" and that other calls had "the purpose to upset . . . plaintiff, to show . . . defendant's unhappiness with [her][,] and concerned deeply personal statements." He also found it "noteworthy that sometimes when the contacts were made, multiple messages were left on the same day in close proximity to each other."

Moreover, Judge Hughes found that defendant's argument that he was worried about Laura was undermined by the contacts with plaintiff between April and July 2017 as well as the fact that defendant did not contact Laura from June until October. Finally, he suggested that defendant "could have called the police or nursing homes or hospitals" if he was urgently worried about Laura rather than travel unannounced to her home and plaintiff's school.

Considering "[t]he conduct in the communications . . . and the backdrop of the[] facts," Judge Hughes determined that plaintiff met the burden to show harassment in violation of N.J.S.A. 2C:33-4.[3] He concluded defendant's "communications and conduct . . . were clearly done in the manner to disturb,

---

[3] While Judge Hughes did not specify which subsection of N.J.S.A. 2C:33-4 he relied upon in making his decision, we glean from the court's ruling and supporting factual findings that either subsection (a) or subsection (c) would have been applicable to defendant's conduct. See R.G. v. R.G., 449 N.J. Super. 208, 224-25 (App. Div. 2017).

irritate, and bother" plaintiff, and that defendant's "entire course of conduct . . . was done in a manner that would clearly . . . worry, trouble[,] or offend" her.[4] Finally, "[b]ased on all the history here and the predicate acts," as well as his belief "that this type of conduct and communication would likely occur again," Judge Hughes found a need for a FRO.

On July 20, 2018, Judge Hughes partially granted plaintiff's motion for attorneys' fees. Specifically, he concluded that plaintiff's request for $17,000 in fees was unreasonable as a portion "appeared to primarily relate to . . . the [January 16, 2018] cross-motion that was filed . . . for disqualification, discovery, [and] discussion between the parties" and did not "relate directly to . . . domestic violence" as required by the PDVA. As such, he awarded plaintiff $9200 in attorneys' fees based on his analysis of the hours spent by plaintiff's counsel in preparation for trial.[5] This appeal followed.

---

[4] Judge Hughes also determined that plaintiff did not meet her burden as it related to the allegation of stalking under N.J.S.A. 2C:12-10.

[5] It does not appear from the record that the court issued an order memorializing its attorneys' fee award. On September 25, 2018, however, the court issued an order which stayed the award of attorneys' fees pending the outcome of this appeal. Defendant did not identify the September 25, 2018 order in his notice of appeal, instead specifying the September 24, 2018 order "entering a[n] [amended FRO] and ordering attorney[s'] fees." The September 24, 2018 amended FRO also did not memorialize the court's July 20, 2018 attorneys' fee

On appeal, defendant argues that the Judge Hughes committed reversible error by finding he committed the predicate act of harassment, as the evidence from the FRO hearing did not establish that defendant had a purpose to harass plaintiff and that plaintiff "never asked him to stop." Instead, he characterizes his conduct and comments as those of a "frustrated" father, and a son seeking to "ascertain the well[-]being of his ninety-five[-]year[-]old mother." Defendant also contends that plaintiff failed to establish a FRO was necessary to protect her from future acts of domestic violence. We disagree and affirm substantially for the reasons expressed in Judge Hughes' thoughtful May 1, 2018 oral decision.

## II.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to a Family Part judge's findings of fact because of their special expertise in family matters, id. at 413, particularly where the evidence is largely testimonial and rests on the judge's credibility findings. Gnall v. Gnall, 222 N.J. 414, 428 (2015). We will not "disturb the 'factual findings and legal conclusions of the trial judge unless [we

___

ruling. We nonetheless address the award of attorneys' fees in Section III for purposes of completeness.

A-0898-18T2

are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

The PDVA accords protection to victims of "domestic violence," a term which the Act defines by listing predicate offenses contained in the New Jersey Criminal Code, and was not intended to encompass "ordinary domestic contretemps." J.D. v. M.D.F., 207 N.J. 458, 473 (2011) (citing N.J.S.A. 2C:25-19(a) and -26); Corrente v. Corrente, 281 N.J. Super. 243, 250 (App. Div. 1995). Before a FRO may issue, the court must engage in a two-prong analysis and make specific factual findings and legal conclusions. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). First, the court must determine, "in light of the previous history of violence between the parties," id. at 125 (quoting Cesare, 154 N.J. at 402), "whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Ibid.; see also N.J.S.A. 2C:25-19(a)(13) (listing harassment as a predicate act of domestic violence).

Upon finding the commission of a predicate act, the court must then determine if a restraining order is necessary to protect the party seeking

restraints from future acts or threats of violence.  <u>Silver</u>, 387 N.J. Super. at 126-27.  In other words, the court must find that "relief is necessary to prevent further abuse."  <u>J.D.</u>, 207 N.J. at 476 (quoting N.J.S.A. 2C:25–29(b)); <u>see also</u> <u>Silver</u>, 387 N.J. Super. at 127 (explaining that the court must find that a FRO is necessary to protect "the victim from an immediate danger or to prevent further abuse").  This second determination, like the first, "must be evaluated in light of the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse," as well as "whether immediate danger to the person or property is present."  <u>Silver</u>, 387 N.J. Super. at 127 (citing N.J.S.A. 2C:25-29(a)(1) and (2)).

Judge Hughes determined that defendant committed the predicate act of harassment.  Pursuant to N.J.S.A. 2C:33-4, "a person commits a petty disorderly persons offense of harassment, if, with purpose to harass another, he" or she:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

20

Defendant maintains that "[t]he trial court erred in finding there was sufficient evidence to establish [defendant] committed an act of harassment." In particular, defendant contends that "the main focus of the voicemails [was] to have [plaintiff] retrieve her belongings from his home and to ascertain [Laura's] well[-]being," and that he "never threatened or actually physically harmed [plaintiff]." Further, defendant argues that because plaintiff "never asked him to stop[,] nor did she have a third party intervene and tell him to stop[,]" Judge Hughes' conclusion that he committed harassment is unsupported by the record.

A "purpose to harass another" is a necessary element of harassment. See N.J.S.A. 2C:33-4; see also J.D., 207 N.J. at 487 (stating that, to find a party acted with purpose to harass, there must be "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient"); State v. Hoffman, 149 N.J. 564, 577 (1997) (explaining that "[a] finding of a purpose to harass may be inferred from the evidence presented," then noting "[c]ommon sense and experience may inform that determination"). We disagree with defendant's claim that the record does not support Judge Hughes' finding that defendant committed the predicate act of harassment.

21

Judge Hughes specifically rejected defendant's claim that he was "simply trying to get his daughter to retrieve her belongings and to check on the welfare of his mother." On this point, he found defendant's repeated attempts at communication were made "with the purpose to upset the plaintiff, to show the defendant's unhappiness with the plaintiff[,] and concerned deeply personal statements." Although he did not specifically employ the phrase "purpose to harass," his rejection of defendant's purported reason for continuously contacting plaintiff, coupled with his finding that defendant's true "purpose" was to "upset" her, sufficiently convey that message. See D.N. v. K.M., 429 N.J. Super. 592, 598 (App. Div. 2013) (deciding in the context of a FRO hearing that "[w]hile the judge could have stated more, giving the deference we must, we are satisfied the findings sufficiently support the court's conclusions").

Further, the record supports a finding that defendant's repeated communications were made with purpose to harass plaintiff, in addition to the remaining elements of the harassment statute. In this regard, we note that defendant's conduct was not an isolated event. The record demonstrates that the communications at issue stretched over several months. According to plaintiff, she last saw defendant in April 2017 and last spoke to him in May 2017. Despite plaintiff's refusal to return his calls, defendant left a slew of disturbing

A-0898-18T2

voicemails throughout the following two months, and then began again in October 2017.

Moreover, defendant had not spoken to plaintiff or Laura in months prior to threatening police involvement and making unannounced visits to plaintiff's school and Laura's home. While plaintiff never specifically informed defendant not to call her, we glean from the record that given the parties' consistent contact until May 2017, her failure to return his calls after May 7, 2017, and the fact that he did not know her address, that defendant was aware plaintiff did not wish to be contacted by him. Nevertheless, he continued to attempt to contact her. Given the totality of the circumstances, we conclude defendant's conduct rises above the level of "ordinary domestic contretemps." See Corrente, 281 N.J. Super. at 250. As such, there is sufficient evidence in the record to infer defendant engaged in a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy" plaintiff in violation of N.J.S.A. 2C:33-4(c).

For similar reasons, we disagree with defendant's claim that Judge Hughes incorrectly concluded a FRO was necessary to protect plaintiff from further harm. Since harassment is an enumerated predicate act of domestic violence, the need to prevent further harassment is sufficient to satisfy Silver's second

A-0898-18T2

prong. Further, because Judge Hughes was required to consider the totality of the circumstances when evaluating defendant's alleged harassing communications, he properly viewed defendant's conduct through the prism of "the realities of the parties' relationship." The parties' history not only supported a finding that defendant committed the predicate act of harassment, as it reflected his intent to annoy plaintiff, but also correctly informed Judge Hughes' consideration regarding the need to protect plaintiff against further abuse.

Indeed, plaintiff testified that even prior to their last meeting, phone conversation, and the ensuing voicemails, she was uncomfortable with defendant's temperament and alcohol consumption, no longer felt safe around him and, accordingly, was never alone with him. In this regard, plaintiff stated that defendant did not know her address. She further testified that the June and July 2017 communications caused her to become worried and "very upset," and affected her physical well-being by causing her to panic and "feel sick the rest of the day" whenever defendant called. That prior history was an appropriate factor warranting the entry of an FRO. See N.J.S.A. 2C:25-29(a)(1). Accordingly, Judge Hughes' determination that a FRO was necessary to protect plaintiff from further abuse is sufficiently supported by the record.

III.

Because we conclude Judge Hughes properly entered a FRO against defendant, we also affirm his July 20, 2018 award of attorneys' fees to plaintiff. The judge's award of attorneys' fees was not an abuse of discretion. See N.J.S.A. 2C:25-29(b)(4); McGowan v. O'Rourke, 391 N.J. Super. 502, 508 (App. Div. 2007).[6]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] We note that defendant has neither challenged the amount nor reasonableness of the requested fees on appeal. He requests only that in the event we reverse the FRO, we "also reverse the award of attorney[s'] fees as [plaintiff] would no longer be . . . the prevailing party." Thus, the amount and reasonableness of the award was not briefed and is deemed waived. Pressler and Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2020).