# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0798-20

IN THE MATTER OF
D.F.[1]

_____

Argued September 30, 2021 – Decided November 4, 2021

Before Judges Alvarez and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. 1515-XTR-2019-1.

Stephanie Palo argued the cause for appellant M.F. (Buchan & Palo, LLC, attorneys; Stephanie Palo and Kevin A. Buchan, of counsel and on the briefs).

Gregory S. Mullens argued the cause for respondent D.F. (Calcagni & Kanefsky, LLP, attorneys; Gregory S. Mullens, of counsel and on the brief; Kevin J. Musiakiewicz, on the brief).

PER CURIAM

Appellant M.F. appeals from an October 9, 2020 order denying entry of a

Final Extreme Risk Protective Order (FERPO) against respondent D.F., pursuant

---

[1] We utilize the parties' initials pursuant to Rule 1:38-3(a).

to the Extreme Risk Protective Order Act of 2018 (the Act), N.J.S.A. 2C:58-20 to -32.  We affirm.

The law framing our discussion is outlined at length in In re D.L.B., ___ N.J. Super. ___, ___ (App. Div. 2021) (slip op. at 2-12).  There, we explained the Act is modeled on the process for obtaining a domestic violence restraining order.  Id. at 4.  The Act contains eight statutory factors under N.J.S.A. 2C:58-23(f), and seven additional factors were promulgated in Administrative Directive #19-19: Guidelines for Extreme Risk Protective Orders (August 12, 2019) (AOC Directive), which courts must consider before entering a FERPO.  Id. at 6-8.  We also described the applicable evidentiary standards, including that the Act provides "[t]he court shall issue the FERPO order if it finds 'by a preponderance of the evidence at the hearing that the respondent poses a significant danger of bodily injury to the respondent's self or others' by possessing a firearm."  Id. at 11 (quoting N.J.S.A. 2C:58-24(b)).

The parties were married in 1995.  Respondent worked as a police officer for the eighteen years preceding the marriage.  He started a commercial landscaping business with appellant in 1996 and subsequently retired from the police force.

A-0798-20

In 2016, respondent admitted himself to a thirty-day inpatient program for alcohol abuse. The treatment center intake records noted he had been diagnosed with depression and anxiety for which he was prescribed medication. He was also diagnosed with severe alcohol abuse disorder. He successfully completed the inpatient program and has never required additional treatment.

Approximately two years after respondent's treatment, the parties divorced. The divorce was tumultuous, culminating in a twenty-four-day trial. In a July 2019 oral decision, the matrimonial trial judge recounted the substantial motion practice, the issuance of a domestic violence temporary restraining order (TRO) and a criminal complaint against appellant, appellant's arrest and incarceration, and her failed attempt to obtain a TRO against respondent. The judge noted the appellant's motives in her efforts to obtain a TRO as follows:

> Time and again in this litigation [appellant] has asked the [c]ourt to prohibit [respondent] from possessing the weapons, claiming she was fearful. There was no fear for many years.
>
> [Respondent] was a police officer for almost [twenty] years, and has extensive firearms safety training. He keeps his weapons in safes. He's a competitive shooter[] and enjoys hunting and shooting. There was never any legitimate reason for the [c]ourt to seize his firearms.
>
> [Appellant] knew how important those firearms were to [respondent], and there were numerous

3

attempts to deprive him of those weapons . . . made in bad faith.

The matrimonial judge ordered an equitable distribution of the business and marital properties. He granted appellant the option of either purchasing respondent's half of the business or selling the business and splitting the proceeds. Pending sale of the business, the judge ordered "[n]o personal expenses shall be paid by [the business]; there will be no distributions to either party; each party will receive a salary[;] . . . and . . . no assets of [the business] other than goods sold in the normal course of business shall be sold or transferred." Notably, respondent was not restrained from the business.

On November 26, 2019, appellant filed a domestic violence complaint and a petition for a Temporary Extreme Risk Protective Order (TERPO). The petition alleged respondent "pose[d] an immediate and present danger of causing bodily injury to [appellant], [himself], or others by owning, possessing, purchasing or receiving firearms and/or ammunition." The petition further stated:

> Respondent allegedly threatened [appellant] on Monday[,] November 18[,] 2019 that Friday would be "light[]s out" for her and that "she'll see" what he meant. Respondent was charge[d] with harassment and simple assault on [January 21, 2006]. Per a Union [Township] police officer's report dated [November 18, 2019] dealing with respondent, he was argumentative

4

towards them when they were questioning him during a dispute.

Respondent was admitted into a substance abuse rehab facility for alcohol and drug abuse. Respondent is currently prescribed Wellbutrin and Adderall for depression. [Appellant] reported that she had to call [9-1-1] when he overdosed on alcohol and prescription medication on June 15[,] 2015 [by] abusing it.

Respondent recently acquired 2500[ pounds] of ammunition.

. . . .

[Appellant] has reported that she is in fear [for] her and her kids['] lives and that the respondent may snap and come after them. It is alleged that the respondent has become more upset and flies of[f] the handle on a regular basis.

The municipal court judge's findings granting the TERPO noted they were based on appellant's testimony that she

was threatened visually in federal court on [Friday, November 22, 2019.[2]] [Respondent] was in [bankruptcy court] as he had a marital interest in her business. She had concerns that [respondent] was abusing drugs and alcohol and believed he could "snap" at any moment. Claims he was verbally abusive in the past and feared for her safety and that of her [fourteen] year old child.

---

[2] This is a reference to appellant's allegation that on November 18 respondent threatened "Friday would be 'lights out[.]'"

5

The TERPO barred respondent from owning, possessing, purchasing or receiving firearms, ammunition, or a firearms purchaser identification card (FPIC). Respondent surrendered these items to police.

Appellant's domestic violence complaint alleged terroristic threats based on the November 18 and 22 incidents, and a history of domestic violence. The court granted the TRO. The domestic violence matter was tried first over the course of two days. Appellant testified and presented testimony from six witnesses, including police personnel, the business's comptroller, its chief financial and operating officer (company executive), and her bankruptcy attorney.

The comptroller testified part of his job duties was to manage surveillance cameras on the business premises. He explained appellant asked him to extract surveillance video from August 26, 2019, of respondent entering her office because she "felt [respondent] went into her office and may have taken something from there." The court described respondent's conduct in the video as "rummaging around on [appellant's] desk. He picks up a couple of documents and then he walks out." The comptroller described another video, dated September 26, 2019, showing a "confrontation between [respondent] and [the company executive]." The comptroller testified he heard the confrontation and

explained respondent was upset because he was looking for a pallet of ammunition which had been delivered the day before and felt the company executive was lying to him about its whereabouts. The comptroller confirmed respondent had "large shipment[s] of ammunition" delivered to the office in the past.

A third video, from November 18, 2019, showed a "confrontation between [appellant] and [respondent,]" which the comptroller overheard. He described "hear[ing] [respondent] yelling that . . . [appellant] pushed him . . . . She denied it. And then as she walked away, [respondent] said, 'Friday it's lights out, it's over for you.' . . . [H]e said that a few times."

Appellant's bankruptcy counsel testified he represented the business in its bankruptcy case and recounted an appearance in United States Bankruptcy Court on Friday, November 22, 2019. He explained respondent approached him stating "there was no way he was ever going to settle the case and that he wanted to be very clear to me." When bankruptcy counsel informed respondent he would not interact with him because he was represented by counsel, respondent "continued to approach" him and remained "[three or four] feet [away]." Counsel explained he entered the courtroom and asked the judge to summon the United States Marshals and respondent's counsel then ushered respondent away.

7

The company executive testified that on September 25, 2019, a staff member alerted him a pallet of shotgun shells were delivered to the company. He stated respondent then appeared and angrily demanded the paperwork for the delivery and the whereabouts of the pallet.

A Union Police Department officer testified he responded to the business on the day of the incident. The officer described respondent as "[v]ery agitated," "condescending," "refus[ing] to cooperate," "disrespectful," and "argumentative[.]" However, after speaking with the officer's supervisor, respondent voluntarily agreed to leave the property. The officer's written report concluded "[t]his was not an act of domestic violence."

Appellant testified respondent abused alcohol and received treatment in 2016 for alcohol and narcotics abuse. She testified she called 9-1-1 at 1:00 a.m. on June 15, 2015, because respondent overdosed. She claimed respondent would "go into rages" a "few times a week." She testified respondent took Xanax, opioids, anti-anxiety medication, and Adderall. She claimed he stopped drinking in February 2016 but resumed in August 2018.

Appellant testified respondent obtained a license to carry a firearm in 2015, but let it expire and obtained another license in 2016. She claimed respondent owned at least forty firearms, which he kept in two gun safes in the

A-0798-20

basement of the home, "in his shoe," "under his side of the mattress," in a locker at a gun club, and at a friend's home. She also recounted he carried firearms "on his person in public without [her] knowledge" which scared her.

Appellant described the August 26 incident as follows:

> I was in my comptroller's office and I saw [respondent] walk by. . . . So I ran to my office and closed my door. And then I went and checked the cameras and I saw him. That he had come into my office. He had taken my mail. And I realized it was my credit card statement. And he was taking pictures of passwords that I had on stickies up on my screen. And he was taking pictures around my office. . . .

Regarding the September 25 incident involving the ammunition delivery, appellant explained when she learned about the delivery she asked her attorney to contact respondent's counsel to remove it. She testified respondent removed the ammunition over the course of two days.

Appellant described the November 18 incident in a similar manner as the comptroller. She explained she dialed 9-1-1 because respondent was in the building and being disruptive, which made her employees "very nervous." Appellant testified respondent was

> yelling you're going to get it, you're going to get it; you'll see, you're going to get it Friday. And then he would say lights out, you're going to get it. I knew we had a court date Friday, but it could be a double message. I don't know. . . . I've lost two of those

9

employees that were sitting in those cubicles shortly after that. It . . . just kept destroying this company. . . . I'm frightened when he gets aggressive like that. . . .

When appellant's counsel asked her how respondent's conduct made her feel, she said:

I felt like he was violating my space. He was harassing me. The last time he took my mail his attorney scanned the mail that was sealed shut in my name[], scanned it[,] and sent it to my attorneys. It was a copy of my credit card statement, the business credit card statement. So it was definitely proof that he had grabbed the mail that was sealed shut from my desk.

Appellant's description of the incident in bankruptcy court mirrored her attorney's. She testified the incident scared her.

On cross-examination, appellant acknowledged the August 26 incident occurred when each party still owned half of the business. She explained there were "disputes ongoing between [her] and [respondent] regarding the spending at [the business]." She conceded respondent was still a part of the company, was collecting a paycheck, and was not barred from the premises. Appellant also testified respondent "ha[d] done some hunting" throughout the marriage and in 2015 started sport shooting.

The Family Part judge found appellant failed to establish a predicate act of domestic violence. The judge found the August 26 incident was part of an

ongoing dispute regarding whether appellant was paying personal bills from the business account. He concluded the September 25 delivery of the ammunition to the business was not intended to intimidate appellant, reasoning as follows:

> Say it was covered with plastic and as far as she knows it was a pallet full of cement. She's the one who felt that shotgun shells somehow should be scary and the fact that he's got lots of weapons. They're legal.
>
> . . . He belonged to an exclusive club. I guess if they're skeet shooting there, you blow through boxes of shot gun shells very quickly.

The judge found respondent had no intent to harass appellant during the November 18 incident because the exchange was mostly with the police officer. The judge stated: "Maybe he was there to show that look, I still have a say in this place and if I want my stuff delivered here, I'm going to have it delivered here. . . . As far as I can tell, he had every right to go there."

The judge concluded the November 22 incident was not domestic violence, but instead respondent expressing his dislike for and appellant's bankruptcy counsel "in the middle of a contentious divorce." The judge dismissed the domestic violence complaint.

FERPO Hearing

After entry of the TERPO, the Ocean County Prosecutor requested to substitute Lavallette Police Sergeant Frank White, who assisted appellant in

11

filing the petition, as the petitioner. The law division judge heard the matter. The prosecutor presented testimony from White and one of the officers who testified in the domestic violence proceeding. Appellant's counsel did not enter an appearance and appellant did not testify. Also pending at the time was complaint against respondent alleging falsification of a FPIC application.

White explained how he assisted appellant with the TERPO application. He explained the evidence produced by appellant, including: respondent's mental health records and substance abuse issues and treatment; appellant's allegations of the history of domestic violence, including the incidents between the parties noted in the domestic violence complaint; the divorce and the ongoing dispute over the marital assets; police reports; and statements.

White testified respondent was not the "subject of or in violation of a temporary, final sexual survivor protective order"; he did not have "prior arrests, pending charges, convictions for violent indictable crime, or [disorderly persons] offense, stalking or [domestic violence] offense"; and was unaware of "reckless[] use[], display[] or brandish[ing] [of] firearms" by respondent. Further, he explained the seizure of respondent's weapons, and that following the seizure respondent contacted the police department identifying more ammunition for them to seize.

12

Regarding the pending charges related to the FPIC application, White explained he was the officer who processed respondent's change of address application for the firearm permit "a couple of months prior." When appellant brought the application to White's attention during the Extreme Risk Protective Order (ERPO) petition, he noted none of the issues flagged in the petition were disclosed in the permit application, including respondent's prescription drug use and mental health history.

The trial judge rendered a comprehensive oral decision. He found both officers[3] credible. The judge applied the statutory and guideline factors.

The judge noted the factors enumerated in N.J.S.A. 2C:58-23(f)(1)-(3), namely, the "history of threats or acts of violence directed towards []self or others;" "history of use, attempted or threatened use of physical force against another [person];" and "whether the respondent has been the subject of or violated a domestic violence temporary restraining order or final restraining order [FRO]," "all deal with allegations in [appellant's] domestic violence complaint." The judge found appellant presented "no new conduct alleged" to

---

[3] Aside from White, the other officer's testimony recounted the weapons seizure process and mirrored his testimony in the domestic violence matter.

A-0798-20

support these factors, and after reviewing the findings from the domestic violence case, applied collateral estoppel.

Notwithstanding the collateral estoppel, the judge noted he "independently reviewed the lengthy transcripts[] . . . of the domestic violence trial" and made the following findings:

> I have independently reviewed [the alleged incident relating to respondent's appearance at the business and removing mail]. . . . I, too, conclude it's not an act of domestic violence, nor is it a threat, act of violence directed towards another, nor is it a threat or threatened use of physical force directed towards another. In fact, it's typical in those types of actions that the parties are fighting over money. With a closely held business, it's also typical that the parties are alleging one or the other is paying personal expenses from the business and that the party paying those expenses on his or her own behalf is receiving [an] advantage while the other party is to a disadvantage.
>
> The second allegation is that [respondent] had a pallet of ammunition delivered to the business consisting of shotgun shells. At first blush, this sounds like it could perhaps be a threat. . . . . According to the domestic violence transcript, this pallet of ammunition came delivered by some delivery service, apparently was offloaded by some type of equipment, it was wrapped in plastic. . . . It was not intended to be a threat.
>
> . . . I also conclude it is not a threat, particularly in light of the fact that the [respondent's] position in this gun club, that he's a skilled shooter, I believe a competitive shooter . . . . This is not an issue of

14

someone pulling out ammunition and say rolling it across the kitchen table at a spouse, making a threat. It's not an act of domestic violence in the domestic violence case and it's not an act of threats or violence towards another in this ERPO case.

It was also testified that [respondent] did that in the past, had these type of things delivered to the business, this ammunition was not necessarily for himself, it was . . . for I believe various other members of the gun club or to be delivered to the gun club.

The third allegation was also at the office of the business owned by the [parties]. . . . [T]he respondent's conduct in that case was not directed towards [appellant], it was not a threat of violence towards anyone. It was not an attempt to use physical force against anyone. It was the police responding to the parties to a divorce arguing over money, not an unusual event, not a threat of any violence. At no time during any of these incidences [is it] alleged that the respondent ever used any firearm, possessed any firearm, had any firearm or mishandled any firearm other than a reference to the ammunition being delivered in bulk like I previously described. . . .

The final incident . . . discussed in the domestic violence . . . proceedings, was that the respondent had a verbal confrontation with the attorney . . . in bankruptcy court. . . .

Nothing whatsoever about that incident qualifies as a threat of violence or the attempted use of physical force against another. Again[,] it was not directed towards [appellant], it was directed towards an attorney. Respondent evidently had this argument over issues involving money associated with the bankruptcy

A-0798-20

and the business. That's not at all unusual in a matrimonial proceeding.[4]

The judge concluded "there's nothing in any of those allegations of domestic violence by [appellant] to establish any of the grounds for [N.J.S.A. 2C:58-23(f)(1)-(3)]."

The judge gave little weight to N.J.S.A. 2C:58-23(f)(5), which requires the court to consider whether a respondent "has prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense pursuant to [N.J.S.A. 2C:12-10], or domestic violence offense enumerated in [N.J.S.A. 2C:25-19]." He found "White specifically testified there was no evidence as to any of those factors. The [c]ourt agrees with that. The respondent's CCH [computerized criminal history] does not contain any criminal record, at least according to the testimony." Petitioner's counsel alleged there were charges against respondent in 2006 for simple assault and harassment, which were dismissed. However, the judge noted "[n]o further information was presented regarding those charges. . . . They don't appear on his CCH. . . . So[,] without any information about these charges and the fact that there's no proof respondent was actually arrested for those offenses, it's

---

[4] The judge noted he reviewed a transcript of respondent's deposition from the divorce in which he expressed a similar dislike for appellant's counsel.

A-0798-20

difficult to determine how they arose." The judge gave no weight to the allegations.

The judge addressed N.J.S.A. 2C:58-23(f)(7), whether a respondent "has any history of drug or alcohol abuse and recovery from this abuse." He reviewed records from the treatment center where respondent was voluntarily admitted for alcohol treatment and a physician's report "supporting his admission." The judge listed the medications taken by respondent including anti-anxiety and anti-depression prescriptions. He also reviewed respondent's psychiatric records and a psychosocial assessment, which showed the reason for his admission was alcohol treatment. The judge stated:

> There's one record . . . that has been submitted by the [appellant] . . . where there's some type of assessment. . . . There's a question, history of suicidal thoughts . . . [a]nd there's an answer, a one-word answer, "yes." There's no explanation provided for that which I found odd. There's no further delineation of when, where, how recent, and then that's followed by a reference to no attempts at suicide. I have reviewed the entirety of those records and that is the only reference to suicidal thoughts, in contrast to multiple references, I think at least a dozen, of no suicidal thoughts, no suicidal ideations.

The judge noted the records reflected no reference to suicidality in respondent's work history. He also referenced a progress note reflecting an interview with appellant in January 2016, in which she reported respondent had

17

no history of harm to himself and others. He noted the admitting professional found "no current or past suicidal or homicidal thoughts. No current suicidal ideations." A safety risk assessment also concluded "there was no risk of suicidal ideations or homicidal ideations, and that finding was specifically made that [respondent] was low risk, no personal safety plan needed to be implemented. He was exhibiting 'minor' anxiety problems only, there was a finding of no psychotic disorder, no personality disorder." The judge concluded: "So in that regard, I discount this one unexplained, unexplored reference to suicidal thoughts when there's multiple references to no suicidal thoughts, no suicidal attempts, no suicidal ideations, low safety risk, no concern, minor anxiety."

The judge also reviewed a psychological summary showing respondent was diagnosed with depression in 2004. He noted "[t]he final diagnosis was substance abuse disorder classified as . . . alcohol use disorder only, severe, no other substances. And additionally there was a mental health diagnosis of . . . major depressive disorder designated or delineated as mild and anxiety [dis]order as unspecified." The judge found no evidence of drug abuse. However, he concluded "there's sufficient evidence that [appellant] has proven

A-0798-20

by a preponderance of the evidence that the respondent has a history of alcohol abuse and recovery from that abuse under factor [seven]."

The judge found no evidence to support N.J.S.A. 2C:58-23(f)(8), whether a respondent "has recently acquired a firearm, ammunition, or other deadly weapon." He found the factor inapplicable because respondent "owned many firearms throughout his adult lifetime[,]" is "an avid marksman, . . . long-standing member" of a gun club, and "a former police officer who also possessed a retired police officer's permit to carry a firearm. . . . So the [c]ourt finds no evidence of recently acquiring a firearm or any improper purpose or manifestation of intent in acquiring a firearm." There was no evidence respondent "tried to obstruct or prevent the officers from seizing the firearms that he tried to obtain or retain any of the firearms."

Because the judge found N.J.S.A. 2C:58-23(f)(7) applied, he addressed the remaining factors in the AOC Directive, factors twelve through fifteen. These factors require the court to assess whether a respondent has been subject to an involuntary commitment, and the respondent's mental health diagnosis, treatment, and compliance with treatment. See AOC Directive at 4-5.

The judge reviewed a psychologist's report who conducted four evaluations of respondent in December 2019 and found "nothing to indicate any

psychiatric disability . . . or that he was a danger in carrying weapons." He noted respondent scored "relatively normal [on psychological tests], there's no clinical evidence of antisocial traits, psychopathy or sociopathy in the overall organization and functioning of his personality." Further, the doctor reviewed respondent's employment record which showed he "[n]ever incurred any disciplinary problem, never used his firearm, never discharged his firearm in the course of his duties, in fact, never even had to remove it, never had his firearm forfeited, had a variety of assignments and a variety of commendations."

The doctor also conducted a substance abuse assessment. Recounting his review of the assessment, the judge noted respondent voluntarily entered alcohol treatment and successfully completed it. The judge also noted the doctor interviewed three of the adult children who were aware of respondent's alcohol treatment and "never saw him act aggressively . . . [or] act in a manner trying to harm anyone including himself, had absolutely no concerns about any drug use. After [respondent's] participation in treatment, [they] never saw him having any problem with drinking or with alcohol to the point of intoxication." The children confirmed respondent shoots competitively and "[t]hey've never seen him act in any way irresponsibl[y] . . . with firearms."

A-0798-20

The doctor also interviewed respondent's psychiatrist who reported respondent was compliant with treatment and his medications and reported "no history of any suicidal, homicidal or impulse control difficulties, that there's never been expressed, displayed or reported any suicidal ideation, self-injurious behavior or homicidal ideations." The doctor concluded respondent was not a danger to himself or others "by having custody or control of, owning, possessing, purchasing[,] or receiving firearms, or that there was anything that would interfere with or handicap his handling of firearms, and he does not have any concerns with regard to that." He also concluded respondent had "resumed appropriate alcohol use," which the judge found corroborated by the testimony of the police officers who stated they "never . . . saw any evidence of alcohol consumption, never saw any issues of [respondent] being under the influence and certainly never saw the respondent using any firearm, sober or intoxicated."

The judge next addressed the pending charges against respondent for falsifying the FPIC application. On the application, respondent answered "no" to the following questions: "(23) Are you an alcoholic[?]"; "(24) Have you ever been confined or committed to a mental institution or hospital . . . for treatment or observation of a mental or psychiatric condition on a temporary, interim[,] or permanent basis[?]"; and "(26) Have you ever attended, treated or observed by

21

any doctor or psychiatrist or at any hospital or mental institution on an inpatient or outpatient basis for any mental or psychiatric condition[?]"

The judge gave no weight to respondent's answer to question twenty-three, finding "a reasonable person would . . . understand that to mean at the time of the application for the change of address."  Regarding question twenty-four, the judge noted respondent admitted to treatment for alcohol, not a mental or psychiatric condition.  The judge found respondent's answer "less than candid and honest" since respondent had been seeing a psychiatrist prior to and at the time of his application.

The judge concluded factor twelve was not met because appellant did not prove respondent was involuntarily committed for "psychiatric disabilities."  He found factor thirteen applicable because respondent was receiving mental health treatment.  Under factor fourteen, he found respondent was compliant with his mental health treatment.  He found factor fifteen applicable because respondent was diagnosed with "mild depression and anxiety."

The judge concluded appellant did not prove by a preponderance of the evidence that respondent "currently poses or will pose in the future a 'significant danger of bodily injury to himself or others' by having firearms."  He stated: "I don't think . . . someone who sought treatment, complies with treatment, is a

22

law-abiding citizen, and has gone through an emotional roller coaster of a divorce case, a domestic violence case, and other legal proceedings including bankruptcy court . . . automatically qualifies for an ERPO." The judge vacated the TERPO and dismissed appellant's petition.

Appellant raises the following points on appeal:

POINT I. ALTHOUGH THE TRIAL COURT CORRECTLY FOUND THAT FACTOR[S SEVEN], [THIRTEEN], [FOURTEEN], AND [FIFTEEN] APPLIED, IT ERRED BY NOT IMPLEMENTING A FERPO BECAUSE THERE WAS SUFFICIENT EVIDENCE PRESENTED THAT [RESPONDENT] POSED A SIGNIFICANT DANGER OF BODILY INJURY TO HIMSELF OR OTHERS BY HAVING FIREARMS.

POINT II. THE TRIAL COURT ERRED BY FINDING IT WAS COLLATERALLY ESTOPPED FROM FINDING FACTORS [ONE], [TWO] OR [THREE] BECAUSE THE TRIAL COURT IN A PARALLEL DOMESTIC VIOLENCE PROCEEDING FOUND THAT THE ALLEGED ACTS OF DOMESTIC VIOLENCE WERE NOT SUBSTANTIATED.

POINT III. THE TRIAL COURT ERRED BY NOT FINDING THAT FACTOR [ONE] (HISTORY OF THREATS OR ACTS OF VIOLENCE) AND FACTOR [TWO] (HISTORY OF THREATS OR USE OF PHYSICAL FORCE) DID NOT APPLY.

POINT IV. FACTOR [FIVE] (PRIOR ARRESTS, PENDING CHARGES, []OR CONVICTIONS) SHOULD HAVE BEEN FOUND TO APPLY BY THE

23

TRIAL COURT BECAUSE RESPONDENT HAD A PENDING CHARGE RELATING TO FALSIFICATION OF A FIREARMS APPLICATION.

POINT V. FACTOR [EIGHT] (RECENT ACQUISITION OF FIREARMS, AMMUNITION, OR DEADLY WEAPON) SHOULD HAVE BEEN FOUND TO APPLY BY THE TRIAL COURT BECAUSE THE RESPONDENT HAD INDISPUTABLY RECENTLY ACQUIRED 2500 POUNDS OF AMMUNITION AND HAD SAME DELIVERED TO [APPELLANT'S] PLACE OF BUSINESS.

## I.

"The scope of appellate review of a trial court's fact-finding function is limited. The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). We do "not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412.

## II.

Points I, III, and IV attack the trial judge's application of the facts to the statutory and guidelines factors. Having considered these arguments in light of

24

the law and our thorough review of the record, we are convinced they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). The judge's findings are amply supported by the substantial credible evidence in the record. We discern no abuse of discretion and affirm for the reasons expressed by the trial judge.

### III.

In Point V appellant argues it is "beyond dispute" respondent had recently acquired a pallet of ammunition. She asserts the judge erred by not applying N.J.S.A. 2C:58-23(f)(8).

N.J.S.A. 2C:58-21 contains the following definitions:

> "Ammunition" means ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm, but does not include any shotgun shot or pellet not designed for use as the single, complete projectile load for one shotgun hull or casing or any unloaded, non-metallic shotgun hull or casing not having a primer.
>
> . . . .
>
> "Recent" means within six months prior to the date the petition was filed.

Respondent's pallet of ammunition met these statutory definitions because it was delivered on September 25, two months before the ERPO was filed. However, the judge applied N.J.S.A. 2C:58-23(f)(7) and addressed the

25

remaining statutory and guideline factors. In other words, the failure to find N.J.S.A. 2C:58-23(f)(8) was harmless error because it did not impede the court's consideration of the remainder of the evidence and the law. "An error is harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict' [—] that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the [fact finder] to a result it otherwise might not have reached.'" State v. J.L.G., 234 N.J. 265, 306 (2018) (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)).

Moreover, the record supports the judge's finding that, under the totality of the circumstances, the delivery was consistent with past practice and the ammunition was intended for sport. We are unconvinced that the ammunition delivery was evidence of respondent's dangerousness.

IV.

Finally, in Point II, appellant argues the trial judge erred by applying collateral estoppel and utilizing the findings in domestic violence case to assess N.J.S.A. 2C:58-23(f)(1), (2) and (3).

Collateral estoppel means "simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe v. Swenson, 397

26

U.S. 436, 443 (1970). "Domestic violence is a term of art which describes a pattern of abusive and controlling behavior which injures its victim." <u>Corrente v. Corrente</u>, 281 N.J. Super. 243, 246 (App. Div. 1995).

N.J.S.A. 2C:58-23(f)(1) and (2) do not employ the term "domestic violence." Rather, N.J.S.A. 2C:58-23(f)(1) speaks to "threats or acts of violence by the respondent" and N.J.S.A. 2C:58-23(f)(2) addresses the "threatened use of physical force by the respondent against another person[.]" For these reasons, collateral estoppel could only be employed regarding N.J.S.A. 2C:58-23(f)(3), which requires the court to consider whether the respondent is the subject of a TRO or a FRO.[5] Regardless, the trial judge did not rely exclusively on collateral estoppel and made independent findings under N.J.S.A. 2C:58-23(f)(1), (2), and (3), which were supported by the substantial credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] We add that, all things being equal, collateral estoppel is appropriate where the petitioner is a victim of domestic violence and does not testify in the ERPO proceeding. The application of collateral estoppel in such a case protects a victim from having to testify about domestic violence in the ERPO proceeding and re-traumatization.

A-0798-20