281 N.J. Super. 243 (1995)
657 A.2d 440
ANNE M. CORRENTE, PLAINTIFF-RESPONDENT,
v.
JOHN D. CORRENTE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 4, 1994.
Decided March 8, 1995.
*244 Before Judges BRODY and LONG.
Dale E. Console argued the cause for appellant (Ulrichsen, Amarel & Eory, attorneys).
No appearance on behalf of respondent (Lewis S. Bowbly, attorney).
The opinion of the court was delivered by LONG, J.A.D.
In November 1993, plaintiff, Anne Corrente, filed a domestic violence complaint against defendant, John Corrente, from whom she was separated. The complaint stated that defendant called plaintiff "at work threatening drastic measures if plaintiff did not *245 supply defendant with money to pay bills." According to the complaint, there was no history of domestic violence in the relationship. A hearing was held at which both parties presented evidence which established that the parties had married in August 1992 and separated in October 1993 as a result of an argument, the details of which were disputed and which did not play a part in this decision. According to the evidence, during the marriage plaintiff gave defendant $170 per week toward the payment of their expenses.
Plaintiff testified to the basis on which she filed the complaint:
John had called me Tuesday November 9th at my job at TJ Maxx in the morning, approximately 10:30 a.m. demanding that I give him the money that I have been giving him every week towards the bills. I told him that I didn't have the whole amount because I have been on my own. He left me a month ago, and he threatened that if I didn't give him the whole amount he would take drastic measure.
When I got home that afternoon the phones were disconnected. I went to my second job, called my mother and told her to call the phone company to see what had happened and she called me back and told me that my sister-in-law had called and canceled my phone with John's authorization in the afternoon and he had canceled the phone.
Q. I see, now this event caused you some annoyance?
Uh hum.
Q. Is that a yes?
Yes.[1]
Plaintiff testified that defendant called her at work twice a day even though he knew he could contact her at home. She said this made her upset because she could not talk at work, a fact of which defendant was well aware. When he called he would ask her to leave the house or to forward the money owed.
Defendant, on the other hand, testified that he called plaintiff on November 9 to tell her he would be stopping by the house to pick *246 up some clothes and to ask her if she had the money for bills. She told him she had spent it and would not be able to pay him either that money or the money for the following week. He then hung up. He subsequently decided to turn the phone off because he could not afford it. He swore that he did not intend to cause her annoyance and he did not believe or know that turning off the phone would cause her to be alarmed or annoyed. He simply could not afford to pay all the bills due to plaintiff's failure to contribute her share. He stated that when he spoke to her in the morning he had not even thought of turning off the phone. He did not later feel compelled to advise her of his intention to end phone service because the phone was in his name. Defendant also testified that plaintiff told a marriage counselor on October 13 that there was absolutely no history of domestic violence.
The trial judge found on this evidence that domestic violence occurred:
I find that there is a conduct on the part of the defendant which causes the plaintiff alarm, which causes her to be harassed. That conduct is to call her up at her place of work and I find that he is doing that. I find that he calls her up at her place of work, makes harassing communications.
I also find that by turning off the phone like that, without giving her notice certainly was to put her in fear and to alarm her. I will sign an order prohibiting the defendant from any future acts of violence. He is barred from [plaintiff's home]. He is prohibited from making any harassing communications to the plaintiff. The plaintiff is granted exclusive possession of the location.
Defendant appeals, contending that the acts complained of do not constitute domestic violence. We agree and reverse.
Domestic violence is a term of art which describes a pattern of abusive and controlling behavior which injures its victim. See, e.g., Marsha J. Kleinman, Family Violence: It can be a killer, 41 N.J. Psychologist (1991); Courtney N. Esposito, Abuse: Breaking the Cycle of Violence: The Victim's Perspective, 8 Trends in Health Care, Law and Ethics (Spring 1993), reprinted in Domestic Violence (New Jersey Institute of Continuing Legal Education 1993).
*247 The Prevention of Domestic Violence Act (repealed, L. 1991, c. 261 § 20, reenacted L. 1991, c. 261 § 1), N.J.S.A. 2C:25-17 to -33, was New Jersey's response to this problem. The findings which undergird the act are set forth at N.J.S.A. 2C:25-18 (emphasis added):
The Legislature finds and declares that domestic violence is a serious crimes against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.
....
The Legislature further finds and declares that even though many of the existing criminal statutes are applicable to acts of domestic violence, previous societal attitudes concerning domestic violence have affected the response of our law enforcement and judicial systems, resulting in these acts receiving different treatment from similar crimes when they occur in a domestic context. The Legislature finds that battered adults presently experience substantial difficulty in gaining access to protection from the judicial system, particularly due to that system's inability to generate a prompt response in an emergency situation.
It is the intent of the Legislature to stress that the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim.... It is further intended that the official response to domestic violence shall communicate the attitude that violent behavior will not be excused or tolerated, and shall make clear the fact that the existing criminal laws and civil remedies created under this act will be enforced without regard to the fact that the violence grows out of a domestic situation.
These findings indicate that the focus of the Legislature was regular serious abuse between spouses. That this is so is underscored by the references to torture, battery, beatings, and killing in the findings. Likewise was the long term damage suffered by children who observe such despicable acts. The way that the Legislature addressed these problems was to provide emergency and long term protection to domestic violence victims whose criminal complaints against their spouses had traditionally been treated cavalierly by law enforcement officers, solely because they arose in the domestic context. Among the remedies provided *248 are exclusion of defendant from the marital premises, suspension of visitation, monetary relief to plaintiff and mandatory counseling. N.J.S.A. 2C:25-29.
In enacting the domestic violence law, the Legislature did not create a new class of offenses or interdict acts which otherwise were not addressed by the criminal law, but ensured that spouses who were subjected to criminal conduct by their mates had full access to the protections of the legal system. Thus, instead of redefining prohibited conduct, the law simply incorporates the following criminal statutes:

 (1) Homicide N.J.S. 2C:11-1 et seq.
 (2) Assault N.J.S. 2C:12-1
 (3) Terroristic threats N.J.S. 2C:12-3
 (4) Kidnapping N.J.S. 2C:13-1
 (5) Criminal restraint N.J.S. 2C:13-2
 (6) False imprisonment N.J.S. 2C:13-3
 (7) Sexual assault N.J.S. 2C:14-2
 (8) Criminal sexual conduct N.J.S. 2C:14-3
 (9) Lewdness N.J.S. 2C:14-4
 (10) Criminal mischief N.J.S. 2C:17-3
 (11) Burglary N.J.S. 2C:18-2
 (12) Criminal trespass N.J.S. 2C:18-3
 (13) Harassment N.J.S. 2C:33-4
 [N.J.S.A. 2C:25-19.]

However, it is clear that the drafters of the law did not intend that the commission of any one of these acts automatically would warrant the issuance of a domestic violence order. The law mandates that acts claimed by a plaintiff to be domestic violence must be evaluated in light of the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse and in light of whether immediate danger to the person or property is present. N.J.S.A. 2C:25-29a(1) and (2). This requirement reflects the reality that domestic violence is ordinarily more than an isolated aberrant act and incorporates the legislative intent to provide a vehicle to protect victims whose safety is threatened. This is the backdrop on which defendant's acts must be evaluated.
*249 Harassment, which is the focus of this case, is defined in N.J.S.A. 2C:33-4 as follows:
Except as provided in subsection d., a person commits a petty disorderly persons offense if, with purpose to harass another, he:
a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.
d. A person commits a crime of the fourth degree if in committing an offense under this section, he acted, at least in part, with ill will, hatred or bias toward, and with a purpose to intimidate, an individual or group of individuals because of race, color, religion, sexual orientation or ethnicity.
The provisions of the harassment statute relevant here are N.J.S.A. 2C:33-4a and c. Integral to a finding of harassment under either section is the establishment of the purpose to harass, which is set forth in the statute itself. D.C. v. T.H., 269 N.J. Super. 458, 461-62, 635 A.2d 1002 (App.Div. 1994); E.K. v. G.K., 241 N.J. Super. 567, 570, 575 A.2d 883 (App.Div. 1990). Section c also requires "a course of alarming conduct" or repeated acts intended to alarm or seriously annoy another, Grant v. Wright, 222 N.J. Super. 191, 196, 536 A.2d 319 (App.Div.) certif. denied, 111 N.J. 562, 546 A.2d 493 (1988). These elements are absent in this case.
First, there was no finding of intent to harass with respect to the calls to plaintiff at work, only that she felt alarmed by them. This falls short of the mandate of the statute. While the judge did find intent to harass in the turning off of the phone, that act was neither repeated nor a course of conduct. In addition, neither the phone calls (which plaintiff testified requested her to move out of the house and pay her share of the household costs) nor the turning off of the phone, which plaintiff remedied immediately by having the phone service restored in her own name, were acts which can be characterized as alarming or seriously annoying.
*250 Separate and apart from these evidential insufficiencies which preclude a finding of the predicate act of harassment, defendant's conduct was plainly never contemplated by the Legislature when it addressed the serious social problem of domestic violence. Plaintiff's complaint asserted that there was no history of domestic violence, and there was no finding by the judge of a history of abuse or an immediate threat to safety. What occurred between these parties, whose relationship had ended and who were living apart, was a conflict over finances and possession of the marital premises. During an argument, tempers flared and defendant threatened drastic measures. He carried out his threat with the childish act of turning off the phone. While this was not conduct to be proud of, plaintiff was neither harmed (except in the most inconsequential way) nor was she subjected to potential injury. As such, the invocation of the domestic violence law trivialized the plight of true victims of domestic violence and misused the legislative vehicle which was developed to protect them. It also had a secondary negative effect: the potential for unfair advantage to a matrimonial litigant. As we said in Murray v. Murray, 267 N.J. Super. 406, 410, 631 A.2d 984 (App.Div. 1993):
We are concerned, too, with the serious policy implications of permitting allegations of this nature to be branded as domestic violence and used by either spouse to secure rulings on critical issues such as support, exclusion from marital residence and property disposition, particularly when aware that a matrimonial action is pending or about to begin.
The domestic violence law was intended to address matters of consequence, not ordinary domestic contretemps such as this. We conclude that on plaintiff's puny proofs, the domestic violence order was unwarranted. Thus we reverse.
NOTES
[1] Plaintiff also testified as to an instance in which she said her clothing was strewn around the residence. Defendant denied this and presented witnesses to controvert plaintiff's story. Because the judge did not resolve the conflicting evidence and did not rely on it for her findings, the details of the testimony will not be set forth here.