RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3165-15T1

V.W.,

 Plaintiff-Respondent,

v.

R.M.B.,

 Defendant-Appellant.
——————————————————————————————-

 Submitted May 10, 2017 – Decided August 1, 2017

 Before Judges Lihotz and Hoffman.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Union County,
 Docket No. FV-20-1028-16.

 Law Offices of Jef Henninger, attorneys for
 appellant (Brent DiMarco, on the brief).

 Weiseman DiGioia, P.A., attorneys for
 respondent (Michael T. Simon, of counsel and
 on the brief).

PER CURIAM

 Defendant R.M.B. appeals from a February 11, 2016 final

restraining order (FRO) entered in favor of plaintiff V.W.,

pursuant to the New Jersey Prevention of Domestic Violence Act,
N.J.S.A. 2C:25-17 to -35 (the Act).1 Because we conclude defendant

did not harass plaintiff, we reverse and vacate the FRO.

 I.

 We discern these facts from the record. When the parties

divorced, they entered into a marital settlement agreement (MSA),

establishing shared legal and residential custody of their

daughter and son. Plaintiff testified a doctor diagnosed her

daughter with "autism and ADHD" two to three years ago, but

defendant never told her this. Plaintiff only learned about her

daughter's diagnosis when another doctor informed her in November

2015. Defendant testified she did not know about the diagnosis

until plaintiff knew. Defendant explained the second doctor told

them that the first doctor's nurse's notes "mention[ed] autism,"

but defendant never saw those notes. Immediately after this

revelation, plaintiff started "badgering" defendant "via text"

that she was "a horrible mother" and tried "to jump ship on the

divorce because [she] knew things were going to get worse."

Defendant claimed she received "a whole bunch of harassment e-

mails . . . as a result of that."

1
 Two months earlier, on December 9, 2015, the court issued an
FRO in favor of R.M.B. against V.W. Because this appeal concerns
the February 2016 FRO, we refer to V.W. as plaintiff and R.M.B.
as defendant.
 2 A-3165-15T1
 Defendant consequently went to speak with the first doctor,

who apologized and said the nurse probably hit the wrong button

by accident when she was "charting" the visit because the system

was new at that time. Defendant explained, "They amended the

notes from three years ago to say that the diagnosis of [autism

spectrum disorder] was placed in [their daughter's] record by

mistake." At defendant's request, the first doctor's hospital

also agreed to have "a full study team" evaluate their daughter.

 On December 9, 2015, the Family Part issued an FRO prohibiting

plaintiff from having any contact with defendant unless it

concerned "the health, safety, and welfare of [their] children."

On January 18, 2016, the parties' daughter had an appointment with

a team of autism professionals who planned to decide whether the

daughter had autism. Plaintiff had physical custody of the

daughter on this date. Plaintiff testified defendant always

scheduled their daughter's appointments, but plaintiff always

either attended or "participated by telephone" when the

appointments were important. Plaintiff admitted defendant "was

in control" during the appointments.

 Defendant testified she had "always taken the kids to doctors'

appointments. In [their] nine years of having kids together,

[plaintiff] probably took the kids to the doctor maybe two, three

times." Defendant consequently believed she was going to take

 3 A-3165-15T1
their daughter to the January 18 appointment "as usual." She

added that she remembered the judge told them during the December

9, 2015 FRO hearing, namely, to do what they had "always . . .

done." Defendant was also concerned plaintiff "exaggerated" their

daughter's symptoms and was "really hoping and dying to have a

major diagnosis," explaining "[i]t fulfills her emotional needs

for attention." She added, "We're still actually in debate on

whether she had autism or not because the psychologist administered

two instruments that showed no evidence of autism," but "[t]he

neurologist decided, yes, let's just call [it] autism, but it's

mild, high functioning autism."

 On January 11, 2016, plaintiff sent defendant a text message,

"So I will be taking [our daughter] on the 18th . . . correct.

When did u plan on telling me that given u knew I had the kids

that day?" Defendant replied, "I sent you all the appointments.

I even explained to you why the neurologist had to be on a different

day . . . . [sic] if you want to [I] can take [our daughter] on

Monday[.]" Plaintiff wrote back, "No u never told me about the

18th and I will take her[.]" Defendant texted, "The neurologist

that was supposed to examine [our daughter] on 1/11 . . . is no

longer with them. That's why I have to take [her] for an additional

appointment on [empty space] for the new neurologists . . . to

examine her[.]" Plaintiff replied, "I am still their mother and

 4 A-3165-15T1
have a right to know. I only know when I looked at the portal.

I wish u would just stop this. It's all just gonna hurt OUR

children. Please let's work together for their sake[.]" Defendant

texted back, "Don't text me. I gave you all the information[.]"

Plaintiff responded, "Fine but u will take her. Stress takes a

toll[.]" Plaintiff sent another text: "I will take her I meant[.]"

She added, "Yes, please don't text me ever again except where it

concerns our children[.]"

 On January 16, 2016, defendant sent plaintiff a text, "I

. . . want to take [our daughter] to [her appointment] on

monday[.]" Plaintiff texted back, "I will take our [daughter to

her appointment.]" Defendant replied, "I want to take [our

daughter] to [her appointment]. It is an important appointment.

And as always, I take care of the significant appointments. Just

like the judge said. I will pick her up at 8:15 and I will call

you when the appointment begins[.]" Plaintiff responded, "No the

judge didn't say that[,] u did[,] and we both know u did so because

of your job flexibility. It's my time with her and I will take

her[.] I will call u when appointment starts. Please don't text

me again about this issue[.]"

 On January 17, 2016, defendant sent plaintiff a text, "I will

pick [our daughter] up at 8:15am[.]" She repeated this text two

minutes later, "I will take [our daughter] to the doctor[.]"

 5 A-3165-15T1
Plaintiff replied, "I asked you to please not text me about this

anymore. It's my parenting time and I will take her." Defendant

texted back, "Then I will be at [the appointment] with a copy of

the FRO[.]" Plaintiff replied, "And I will be there with the MSA

showing you are impending [sic] upon my parenting time[.]"

Plaintiff explained, "The custody and agreements in such have not

be[en] changed by a judge[.]"

 After this exchange, plaintiff testified she was "[s]cared

stiff" because she was "afraid" defendant "was trying to get [her]

arrested in front of" their children, and she "would never want

[their] children to see anything like that." Plaintiff

consequently asked a friend to accompany her and the children to

the appointment. The friend knew both parties because they had

lived as neighbors before they divorced.

 When plaintiff arrived at the appointment with the children

and friend, she told the registrar "about the situation with the

restraining order" and showed her the MSA. The registrar took her

back to a supervisor. While they were waiting "near the front

entrance of the hospital," defendant entered.

 Defendant first started screaming at the friend, saying "you

don't belong here, what are you doing here[?]" Defendant then

tried to grab the parties' son away from the friend. Defendant

also started screaming her daughter's name, trying to get her to

 6 A-3165-15T1
come to her. Plaintiff said the friend "put her arms out like she

was trying to . . . block everything from happening." Defendant

then "knock[ed]" into the friend, and when defendant tried to "get

over" plaintiff's back, defendant also "knocked" plaintiff.

Plaintiff consequently called the police. A manager eventually

got in between plaintiff and defendant, raising her arms sideways

to keep them separate. Some hospital staff then "took" defendant

"into a room."

 Plaintiff introduced the results of that day's subsequent

medical exam. The neurologist concluded, "Based on many of the

above criteria and after extensive conversation with her parents,

[the parties' daughter] does meet criteria for an autism spectrum

disorder."

 Defendant disputed much of plaintiff's testimony. Defendant

said that when she entered the lobby, hospital staff "were already

between" her and plaintiff, their children, and the friend. She

could not "get anywhere close to them." She did not "remember"

her "hands touching anything – anybody's shoulder or hands." She

nevertheless admitted she raised her arm for their daughter and

asked her to come to her. Defendant "was upset" and said the

friend "should not be here." Defendant said she had the FRO; she

"made the appointment;" and she "usually . . . accompanies the

kids for all of their medical appointments." Plaintiff then "all

 7 A-3165-15T1
of a sudden, was in [her] face." "She said, recording, recording,

recording. She was videotaping, and there was nothing to

videotape." Defendant testified she felt like she had been "set

up." Before anything more occurred, plaintiff walked away with

their children and friend, and hospital staff asked defendant to

go to another room; she complied.

 When the police arrived, they told defendant that she could

only join their daughter's appointment by telephone because

plaintiff had shown them the MSA, which stated she had physical

custody of their daughter that day. The hospital staff arranged

for defendant to use a telephone in one of its conference rooms.

 The same day, plaintiff filed a domestic violence complaint

seeking a restraining order against defendant. After hearing the

testimony of plaintiff, defendant, and their friend at the February

11, 2016 FRO hearing, the court made the following credibility

finding:

 The [c]ourt has observed both the parties
 testifying, has observed the witness, and
 finds them all to have a certain degree of
 credibility. There are some differences in
 the testimony among the parties. The
 differences are – when looked at, are really
 not greatly significant. There's an agreement
 on most aspects of what's going on, at least
 factually. So, all the parties are found to
 be credible, and the witness is found to be
 credible.

 8 A-3165-15T1
The court then noted that the first FRO "did not change anything

other than the pick up and drop off." The court said, "The

question for this [c]ourt is whether what occurred is harassment

. . . . [I]t doesn't take a lot in this type of case to demonstrate

that." The court then observed when plaintiff's text said she was

going to take the daughter to the appointment, defendant "persisted

on taking her and – texting."

 Then, when [she] finally realizes that she's
 not going to get anywhere with that, she folds
 up the FRO as a sword – not as a shield, as a
 sword. Because when you say I'm coming to the
 hospital on your visitation day, when you've
 told me you're taking the child to see the
 doctor on your day and I don't have to, and I
 say, well, I'm going to be there anyway, I'm
 going to bring the FRO and show up to the
 hospital, there's no other purpose in saying
 that other than to alarm somebody.

The court therefore concluded, "[P]laintiff has proved by a

preponderance that a predicate act under the . . . Act has been

committed, specifically in this case harassment." The court

consequently entered the FRO under review.

 II.

 We exercise a limited scope of review over a trial judge's

findings of fact. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of

Am., 65 N.J. 474, 484 (1974). We give due regard to the trial

judge's credibility determinations based upon the opportunity of

 9 A-3165-15T1
the trial judge to see and hear the witnesses. Cesare v. Cesare,

154 N.J. 394, 411-12 (1998).

 The Act defines domestic violence by a list of predicate

offenses found within the New Jersey Criminal Code. J.D. v.

M.D.F., 207 N.J. 458, 473 (2011). We have held the commission of

any one of the predicate offenses does not automatically mandate

entry of a domestic violence restraining order. Kamen v. Egan,

322 N.J. Super. 222, 227 (App. Div. 1999).

 A judge's review of a domestic violence complaint is two-

fold. Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006).

The first step is to "determine whether the plaintiff has proven,

by a preponderance of the credible evidence, that one or more of

the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred."

Ibid. The acts claimed by "plaintiff to be domestic violence must

be evaluated in light of the previous history of domestic violence

between the plaintiff and defendant including previous threats,

harassment, and physical abuse and in light of whether immediate

danger to the person or property is present." Corrente v.

Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995). The second

step asks whether, after finding the commission of a predicate

offense for domestic violence, "the court should enter a

restraining order that provides protection for the victim."

Silver, supra, 387 N.J. Super. at 126. Therefore, "the guiding

 10 A-3165-15T1
standard is whether a restraining order is necessary, upon an

evaluation of the factors set forth in N.J.S.A. [2C:25-29(a)(1)

to -(6)], to protect the victim from an immediate danger or to

prevent further abuse." Id. at 127. Those factors include:

 (1) The previous history of domestic violence
 between the plaintiff and defendant, including
 threats, harassment and physical abuse;

 (2) The existence of immediate danger to
 person or property;

 (3) The financial circumstances of the
 plaintiff and defendant;

 (4) The best interests of the victim and any
 child;

 (5) In determining custody and parenting time
 the protection of the victim's safety; and

 (6) The existence of a verifiable order of
 protection from another jurisdiction.

 [N.J.S.A. 2C:25-29(a).]

Here, the judge concluded defendant committed harassment, N.J.S.A.

2C:25-19(a)(13). A person commits the petty disorderly persons

offense of harassment, pursuant to N.J.S.A. 2C:33-4, if, with

purpose to harass another, he or she:

 (a) Makes, or causes to be made, a
 communication or communications anonymously
 or at extremely inconvenient hours, or in
 offensively coarse language, or any other
 manner likely to cause annoyance or alarm;

 (b) subjects another to striking, kicking,
 shoving, or other offensive touching, or
 threatens to do so; or
 11 A-3165-15T1
 (c) engages in any other course of alarming
 conduct or of repeatedly committed acts with
 purpose to alarm or seriously annoy such other
 person.

For a finding of harassment under N.J.S.A. 2C:33-4, the actor must

have the purpose to harass. Corrente, supra, 281 N.J. Super. at

249. Finding a party had the purpose to harass must be supported

by evidence the party's "conscious object was to alarm or annoy;

mere awareness that someone might be alarmed or annoyed is

insufficient." J.D., supra, 207 N.J. at 487. Additionally, our

courts must be mindful of cases involving "the interactions of a

couple in the midst of a breakup of a relationship." Ibid.

 The evidence in the record does not establish defendant

harassed plaintiff pursuant to N.J.S.A. 2C:33-4. The trial court

relied on defendant's texts to conclude she harassed plaintiff.

Defendant simply said, "Then I will be at [the appointment] with

a copy of the FRO[.]" Defendant obviously believed, mistakenly,

the FRO gave her the exclusive right to bring their daughter to

the appointment. Plaintiff responded, "And I will be there with

the MSA showing you are impending [sic] upon my parenting time[.]"

Plaintiff even explained, "The custody and agreements in such have

not be[en] changed by a judge[.]" Plaintiff clearly understood

she was not going to violate the FRO when she brought their

daughter to the appointment. The record does not support a finding

 12 A-3165-15T1
that defendant intended to harass plaintiff, N.J.S.A. 2C:33-4;

Corrente, supra, 281 N.J. Super at 249; rather, defendant simply

communicated her intention to enforce what she mistakenly believed

the December 2015 FRO granted her the right to do. "[M]ere

awareness that someone might be alarmed or annoyed is

insufficient." J.D., supra, 207 N.J. at 487. We therefore vacate

the February 11, 2016 FRO and remand to the trial court for the

entry of a confirming order.

 Vacated and remanded. We do not retain jurisdiction.

 13 A-3165-15T1