# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3636-19

E.R.B.[1],

    Plaintiff-Respondent,

v.

M.A.M.,

    Defendant-Appellant.

_____

        Argued November 8, 2021 – Decided December 1, 2021

        Before Judges Fasciale and Firko.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FV-14-0748-20.

        Fania Veksler argued the cause for appellant.

        Marianne J. McGlone argued the cause for respondent (McGlone McGlone & Belardinelli, attorneys; Marianne J. McGlone, on the brief).

PER CURIAM

---

[1] We use initials to protect the identity of the victim. R. 1:38-3(c)(12).

Defendant M.A.M., who had a dating relationship with plaintiff E.R.B., appeals from a May 22, 2020 final restraining order (FRO) entered under the New Jersey Prevention of Domestic Violence Act (NJPDVA), N.J.S.A. 2C:25-17 to -35.  In her appeal, defendant claims the Family Part judge failed to apply the two-step process required under Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006) and did not consider the evidence.  We disagree and affirm.

I.

The factual history is derived from the record and hearing.  Plaintiff, a New Jersey State Trooper, was involved in a romantic relationship with defendant, who is employed by the New Jersey State Police as a dispatcher, for one-and-a-half years.  They resided at plaintiff's home with her then-six-year-old son from a prior relationship.  Following the end of the relationship in mid-March 2020, plaintiff discovered defendant was having an affair with another woman while they were dating.

Defendant's "good friend" called plaintiff and informed her "that she . . . was watching [defendant']s location [on a phone application,] and [defendant] was bee-lining her way over to [plaintiff's] residence."  Plaintiff stated she "was terrified" because she "realized that if [defendant] was coming to [plaintiff's] house, it was to confront [plaintiff] about the conversation between [her] and"

the woman defendant was having an affair with. Prior to her arrival at plaintiff's home, defendant called her multiple times and sent the following string of text messages to her:

> Lol when I get home im [sic] putting a fucking bullet in my head.
>
> Fuck you.
>
> Thank you.
>
> For everything you've done.
>
> Answer the phone.
>
> Answer the phone.
>
> Answer the phone.
>
> Answer the phone.
>
> Answer [sic].
>
> Answer the phone.
>
> Answer the phone.
>
> The truth is not yours to tell her.

Plaintiff testified she did not answer defendant's calls "[b]ecause [she] was fearful what [defendant's] intent was, what she was doing, where she was going, [and] if she was going to hurt [plaintiff] and [her] son." In addition, plaintiff testified that she was aware defendant kept a loaded firearm in her glove

3

compartment, and plaintiff stated she "didn't know what was going to happen because [defendant is] very unpredictable with her actions."[2] When asked why she believes defendant is unpredictable, plaintiff testified:

> Because she can change like a light switch. She can be very happy and then all of a sudden[,] . . . she gets very upset with things.
>
> She's punched holes in walls . . . at our old house[] [and] at her mom's house. She gets very upset very quickly, very easily. And with something like this, . . . especially because it involved her paramour, she was even more upset.[3]

Plaintiff stated the parties "had interactions in the past in which [defendant] had pushed [plaintiff] or restrained [plaintiff's] body physically," and that at one time prior, defendant threw plaintiff into "a dresser in [their] hallway." Plaintiff claimed defendant "used to . . . restrain [her] within [their] home all the time so that [defendant] could continue disagreements." Further, plaintiff testified that "one other time[,] during another disagreement[,] . . . [plaintiff] was [lying] in bed and [defendant] took . . . [defendant's] gun out of

_____

[2] Defendant legally owned the firearm although it was registered under her former name.

[3] Plaintiff also testified defendant "has seventeen years['] experience in taekwondo" and is "a [third-]degree black belt."

A-3636-19

[defendant's] safe and put it to her [own] head and . . . said [']is this what you want me to do?[']"  Plaintiff stated "eventually the situation was diffused, . . . [and] there was no harm done," but that "it was [obviously] terrifying."[4]

Plaintiff also testified she "was definitely under the impression that [defendant] was going to confront [her]" when she arrived at her home, but she "didn't know how violent it was going to end up.  So [plaintiff] closed all of [her] blinds, locked all [her] windows, and . . . told [her son] to stay upstairs in the room."  Defendant arrived at plaintiff's home at approximately 8:00 p.m.

Once defendant arrived at her home, plaintiff testified she began "banging on [the] door and yelling [very loudly] through the door and pacing around the front of the house."  Plaintiff "eventually" let defendant in because she "was trying to avoid police involvement due to [a noise complaint and because of] the nature of [her and defendant's] careers"; and because plaintiff "didn't want there to be any . . . distress between [her] neighbors and [her]self."[5]

---

[4]  Defendant testified this never occurred.

[5]  Plaintiff testified she let defendant in "[t]hinking [plaintiff] could diffuse the situation."

When plaintiff opened the door, defendant "came in, she went upstairs, she grabbed her things, then she started a verbal altercation with [plaintiff], referenced [defendant's] items, and was . . . very heated." Plaintiff claimed she

> [W]as still aware that [defendant] had the firearm in her car, [and she] didn't want [defendant] to go back to her car in that state of mind without either calming her down or taking possession of the firearm.
>
> So, [plaintiff] blocked the exit . . . until [she] could get [defendant] to calm down. [She] did not touch [defendant]. [She] did not restrain [defendant] physically, [she] just blocked the exits.

Plaintiff testified defendant "was coming at [her], and then [defendant] threw her keys in [plaintiff's] living room, so [plaintiff] retrieved them" and said to defendant, "[Y]ou can go for [a] walk until you calm down. Once you calm down, and I see that, I'll let you go." In response, defendant "refused and got very, very upset." The parties then "ended up in the kitchen and [defendant] began] scavenging through [plaintiff's] items." Defendant "found a knife . . . [and] came at [plaintiff] with the knife." Defendant testified that she held the knife with her "knuckles to the ceiling, [her] palm to the floor, and the blade

A-3636-19

pointing away from [her] body."[6] Plaintiff stated "at [that] point, . . . [she] was very threatened for [her] life," and her son's life, who was upstairs at the time.

Eventually, defendant put the weapon down. Plaintiff stated she then "asked [defendant] why [defendant] wanted to hurt [her,] and [defendant] picked [the knife] back up[,] . . . put it toward her [own] throat, . . . said, ['D]oes it look like I'm trying to hurt you[?,'] [a]nd got very upset again." Defendant "saw that [plaintiff] had [her] firearm on [her] hip," "and got very upset. So [plaintiff] took it out" and "put it on the table." However, plaintiff testified that she then "realized [the gun] was . . . within reach of [defendant], and it was loaded. So [plaintiff] unloaded it, took the spare round[s] out, put them in [her] pockets, [and] put the firearm back on the table." Plaintiff testified she then "gave [defendant] the keys," she "stayed close to [defendant] when she was going into her car," and defendant "grabbed the . . . loaded firearm from her glove compartment[,] . . . handed it to [plaintiff,] and [defendant] was on her way."

Plaintiff later testified that "after [she and defendant] tussled, when [defendant] saw [her] firearm, . . . [they] ended up tussling again" and "[a]t one point [defendant] struck [her] in the chin, relatively hard." Plaintiff claimed she

---

[6] Although the judge found defendant's "version of the events" of March 30 "not credible," he deemed this portion of defendant's testimony credible.

"looked at [defendant] with fear and . . . surprise, and [defendant] just kind of shrugged her shoulder, like too bad."[7]

In the weeks following the incident, plaintiff testified she and defendant "were speaking through . . . text messages . . . [about] cleaning out the house[,] . . . dividing up the property[,] and everything [else necessary] to finish the relationship." Plaintiff also testified that "generally with . . . the entire relationship, there was a lot of . . . emotional abuse, . . . a lot of physical abuse," and "a lot of . . . fear by [plaintiff]." She thought her son was concerned as well because defendant "broke a hole in his wall in front of him."

---

[7] Defendant testified that she "just went there to get [her] clothes and leave," but after retrieving her belongings, she and plaintiff decided they were "gonna talk." Defendant stated she and plaintiff then began "arguing with each other"; defendant "heard something [that] . . . sounded like feedback . . . on a cell phone," and she realized plaintiff had someone on the phone "listening to [them argue]," and defendant got upset at that point and attempted to leave. Like plaintiff, defendant testified the parties first "tussled" when defendant tried to leave "[a]nd [plaintiff] ran to the front door" and was "blocking [defendant], . . . trying to pull [her] away from the door." Defendant claimed that she "ran from the door in the front of the house to the door on the side of the house, to the sliding glass door, back to the front door, back to the side," and she asked plaintiff to "please just let [her] leave," but plaintiff "told [her] that she didn't want [defendant] to leave because [defendant] was too angry to drive." Defendant testified that she "never raised [her] hand to strike [plaintiff] in her jaw," and if she did "hit" plaintiff, "it was accidental" and she "didn't know."

A-3636-19

On April 17, 2020, at 1:56 p.m., defendant messaged plaintiff about a balance she owed plaintiff for "stuff that [they] used for [their] house when [they] lived [together]." Plaintiff responded, and shortly thereafter sent defendant a "link" that defendant had sent plaintiff at some undisclosed time prior. Defendant responded, "It was a good year and I thank you for it. I don't want to fight with you or have any problems but we both know the relationship is over." Plaintiff responded, "Because of you," and defendant responded, "Yes."

The record shows that at some point on April 17, 2020, the following text message exchange occurred between defendant and plaintiff:

> [Defendant:] Do you park . . . on the dead end behind your house or is that just where [troopers] who don't wanna be found park[?]
>
> [Plaintiff:] Where? In my driveway?
>
> [Plaintiff:] Or on my street?
>
> [Defendant:] Alright[,] enough of this[.]
>
> [Plaintiff:] I honestly don't get it[.]
>
> [Defendant:] If you're fucking a trooper[, I] know who it is and where he parks his car while he's on night shift and goes to visit you[.]

A-3636-19

> [Defendant:] If you aren't fucking a trooper
> than you have a [N]etcong guy for a
> neighbor.

Later that day, plaintiff filed a complaint in the Mount Olive municipal court against defendant under the NJPDVA seeking a temporary restraining order (TRO).  In her complaint, plaintiff alleged that on March 30, 2020:

> Defendant came to [plaintiff's] residence and threatened her.  [Plaintiff] advised [that] defendant is a [third-]degree black belt and "was chasing [her] with a knife". . . .  Defendant stated, "I'll shoot myself in the head".  [Plaintiff] advised she did let . . . defendant inside to calm her down.  Today[, April 30, 2020,] [plaintiff] stated that . . . defendant is "stalking" her house and [plaintiff] [is afraid] for her [own] safety and her son['s].

The TRO was issued.  On May 20, 2020, the Family Part judge conducted the FRO hearing via Zoom, which lasted approximately eight-and-a-half hours.

After considering the parties' testimony and evidence, including the details of the text messages, the judge found plaintiff credible and did not accept defendant's version of events.

In his opinion, the judge found:

> [Defendant] says she was going there to get things.  <u>I don't recall any testimony that she took anything out of the house other than her person</u>, when she left the house that day.  Nothing.

> You know, there was no testimony about her saying, you know, well . . . where's my tennis racket? Where's my . . . clothes? Where's—nothing. Nothing. You know, . . . <u>this was a trip to . . . plaintiff's house, in the [c]ourt's opinion, for confrontation</u>.

[(Emphases added).]

The judge also indicated he based his credibility determinations and concomitant factual findings concerning the events of March 30—as well as his ultimate legal conclusion domestic violence occurred that day—on the following findings:

> [P]laintiff says . . . when . . . defendant walked into the house, <u>the first thing [defendant] did was take [defendant's] car keys and throw them at the wall</u>. And that . . . plaintiff picked up the car keys and did not want . . . defendant to leave if she was distraught. . . .
>
> <u>I don't think the intent of . . . plaintiff was to engage in . . . an altercation</u>. I think she was trying to diffuse whatever it was upsetting . . . defendant. . . .
>
> And I really don't know what is upsetting . . . defendant, but . . . <u>my suspicion . . . is that . . . this breakup, . . . plaintiff got over it fairly quickly. . . . [D]efendant did not get over the breakup</u>. You know? Despite the fact that she was having relations with another woman at that time. Which caused the break in itself. . . .
>
> And . . . what does that show me at this point in time? It shows me that [plaintiff] is not really trying to control [defendant]. But [defendant], she wants to control [plaintiff]. You know? Despite the breakup

11

being [defendant's] fault, she still wants to control the situation.

[Defendant] . . . is a [third-]degree black belt. . . . I strongly doubt that [she] . . . couldn't get out a door if she wanted to.

[(Emphases added).]

Further, the judge indicated he did not "accept that [defendant] was defending herself" when she picked up the knife because plaintiff's "gun [was] on the counter." The judge emphasized, "Clearly, if . . . plaintiff was the person who was trying to intimidate somebody, I doubt she would have taken the gun out of her holster, put the holster on the counter, taken both magazines, put them up on the counter, taken the one out of the chamber, [and] put it in her pocket . . . ."

The judge continued:

[W]hen somebody shows up at somebody's house with a gun in the glovebox, loaded, pulls a knife out, whether [defendant] intended to hurt anybody or not, . . . I don't know if she had the intent to . . . physically hurt anybody, but I do think emotionally, . . . by doing this, she was trying to hurt . . . plaintiff to perhaps have her stay in the relationship.

The judge also noted, "[D]efendant, by the way, denies that she punched . . . plaintiff in the face. But again, my feel for the case, my findings on credibility,

12

A-3636-19

I accept the plaintiff's testimony that it was a strike to the . . . face[,] to the jaw at that point in time."[8]

The judge also said that defendant's "text message[] threatening self-harm[] [was] clearly upsetting to . . . plaintiff."  The judge explained:

> [Y]ou're engaged to be married to a person and that person's threatening to shoot themself in the head, with a gun that they have access to?  Not just talk.  You know, if somebody says, I'm gonna shoot myself in the head, and they don't own a firearm, or have access to a firearm, you know, I doubt people are gonna take that seriously.
>
> But if somebody has taken a gun out of a safe, held it to their head, and said that, on a prior occasion, and then after a breakup says that they're going to put a bullet in their head, because they don't like the way things . . . are happening, and then they're saying, pick up the phone, you know, . . . obviously she's calling her.  One, two, three, four, five, six, seven.  You know?

The judge concluded domestic violence occurred on March 30, 2020.

The judge then addressed defendant's text messages to plaintiff on April 17, 2020, concerning a State Trooper's car parked outside of plaintiff's home, and found the text messages

> evidenced to . . . plaintiff[], as [they did] to the [c]ourt, that again, the element of control sought by . . . defendant over . . . plaintiff was continuing. . . .

---

[8]  The judge also accepted "plaintiff's testimony that [there] w[as] prior shoving," and that "[a]t one point [plaintiff] . . . got shoved into . . . a cabinet."

A-3636-19

[A]bout a month after the breakup. . . . [D]efendant had no reason to be in . . . plaintiff's neighborhood, behind her house. I won't use the term stalking, but clearly surveilling the situation.

And even if she saw what she saw, she couldn't help herself but to unleash this on . . . plaintiff. . . . [I]t shows that [defendant] is jealous that . . . plaintiff may have actually found somebody new, despite the fact that . . . defendant was the cause of the breakup. And obviously found somebody new herself well before the breakup, while the parties were in a relationship. So . . . why is she allowed to control what . . . plaintiff is going to do with her personal life at this point in time?

And [defendant] can't control herself. . . . [It's] bad enough she's skulking about in the backyard area of . . . plaintiff's house . . . .

But not only is that going on, she has to tell [plaintiff], you know? And not only does she tell her, by her words that she saw it, you know? She has to voice . . . [she's] upset, you know? That if [plaintiff]'s having a relationship with a trooper, she knows who it is.

And where he parks the car, . . . why would you say that? You know? It is clearly not only a controlling statement, it is a veiled threat, . . . that the [c]ourt interprets . . . that you know if [defendant] knows, maybe other people are gonna know.

And that is what really kind of tipped the apple cart in the [c]ourt's opinion, and in . . . plaintiff's opinion, based upon her testimony.

And that's why she went in and filed a report.

14

The judge reasoned that when he coupled the events of March 30 with what happened on or about April 17, he found "a pattern of continued abuse" and "harassment." The judge concluded there was a "need" under Silver for an FRO "based upon the grounds of harassment."

On appeal, defendant argues:

> I. THIS COURT MUST VACATE THE [FRO] ISSUED BY THE TRIAL COURT AGAINST [DEFENDANT] BECAUSE ITS ISSUANCE IS SO MANIFESTLY UNSUPPORTED BY OR INCONSISTENT WITH THE COMPETENT, RELEVANT AND REASONABLY CREDIBLE EVIDENCE AS TO OFFEND THE INTEREST OF JUSTICE (Not Raised Below).
>
> A. IN ISSUING THE FRO[,] THE TRIAL COURT FAILED TO ADDRESS THE SECOND PRONG OF SILVER v. SILVER; THUS, THE FRO MUST BE VACATED (Not Raised Below).
>
> B. THE TRIAL COURT['S] FINDINGS WERE CONTRARY TO THE WEIGHT AND SCOPE OF THE EVIDENCE [ELICITED] AT TRIAL RESULTING IN MANIFEST INJUSTICE (Not Raised Below).
>
> C. THE [JUDGE] ASSUMED FACTS NOT IN EVIDENCE IN RENDERING HIS DECISION (Not Raised Below).
>
> II. DEFENDANT . . . WAS PREJUDICED WHEN PLAINTIFF . . . APPEARED IN THE DRIVER'S SIDE OF HER PATROL VEHICLE ON DUTY

15

FOR THE COURT'S DECISION (Raised Below.)

II.

When determining whether to grant an FRO pursuant to the NJPDVA, the judge must make two determinations. See Silver, 387 N.J. Super. at 125-27. Under the first Silver prong, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). Here, plaintiff alleged that defendant engaged in harassment.

A person is guilty of harassment where, "with purpose to harass another, he" or she:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4.]

A-3636-19

Harassment requires the defendant to act with the purpose of harassing the victim. See J.D. v. M.D.F., 207 N.J. 458, 487 (2011). A judge may use "[c]ommon sense and experience" when determining a defendant's intent. State v. Hoffman, 149 N.J. 564, 577 (1997).

Under the second Silver prong, a judge must also determine "whether a restraining order is necessary . . . to protect the [plaintiff] from" future acts or threats of violence. 387 N.J. Super. at 127. The commission of one of the predicate acts of domestic violence set forth in N.J.S.A. 2C:25-19(a) does not, on its own, "automatically . . . warrant the issuance of a domestic violence [restraining] order." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995). Although that determination "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127 (citation omitted).

Physical abuse is not the only type of domestic violence contemplated by the NJPDVA; the Act is also designed to address emotional abuse. See R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017) (finding an FRO is warranted where the defendant's conduct is "imbued by a desire to abuse or control the

[plaintiff]." (emphasis added) (citing Silver, 387 N.J. Super. at 126-27)). Here, the judge found the FRO was necessary to protect plaintiff by relying on her credible testimony that she was frightened by defendant's behavior on March 30, 2020.

Despite the undisputed fact that the parties were no longer romantically involved, the judge emphasized defendant continued to surveil plaintiff in the sanctuary of her own home where she should "feel safe" with her family. The judge determined that defendant's interrogation of plaintiff about whether she is having a relationship with a trooper "is a veiled threat" and "a controlling statement." Moreover, the judge found defendant exhibited a "pattern of control," "a pattern of continued abuse" and "harassment."

Applying the governing principles, the judge concluded there was a need for plaintiff to be granted an FRO under Silver.[9] He also told defendant, "I cannot have you with a firearm." The judge also found the text messages caused plaintiff to feel "unsafe" and "caused her to be concerned for the safety of her son, as well as herself." The second prong of Silver was properly analyzed and addressed by the judge. We conclude there is no basis to disturb the judge's

---

[9] Our opinion does not prejudice plaintiff's right to move—should she deem it appropriate—before the Family Part judge to amend the FRO to include protection for her son, who is a member of her household.

factual findings or legal conclusions. The judge heard testimony from the parties and had ample opportunity to assess credibility. There exists sufficient evidence in the record to support both <u>Silver</u> prongs, and we see no evidentiary errors, oversight, or abuse of discretion.

To the extent we have not addressed defendant's other arguments, it is because they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION