# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2416-22

IN THE MATTER OF J.C.G.

_____

Submitted April 22, 2024 – Decided May 1, 2024

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. 0258 XTR 2022 000002.

The Tormey Law Firm, LLC, attorneys for appellant J.C.G. (Travis J. Tormey, of counsel; Jeffrey Anthony Skiendziul, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent State of New Jersey (K. Charles Deutsch, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Appellant J.C.G.[1] appeals from the trial court's April 11, 2023 order entering a Final Extreme Risk Protective Order (FERPO) against him pursuant

_____

[1] Records relating to Temporary Extreme Risk Protective Order (TERPO) and FERPO proceedings are confidential and shall not be disclosed to persons other

to the Extreme Risk Protective Order Act of 2018 (the Act), N.J.S.A. 2C:58-20 to -32.  We affirm.

We take the following facts from the trial record, which included documentary evidence and the testimony of the applicant, Saddle River Police Officer Frank Licari, and appellant.  On June 17, 2022, appellant entered Saddle River Police Department with his daughter and reported he had been in an argument with his wife.  Officer Licari spoke with appellant, who reported his wife threatened to claim he kidnapped their child if he took her to the park, and appellant wanted to make sure police knew that he had not kidnapped his daughter.

Appellant then told officers he did not care if they "lock him up or shoot him."  The officers asked him to elaborate, and he said, "he didn't want to hurt himself or others."  When asked why he made the remark, appellant stated, "with everything going on in the world, why would anybody want to live on this earth." Officers called a psychiatric helpline and were told appellant's remarks did not mandate his involuntary commitment, but helpline personnel offered to conduct a psychiatric screening, which appellant declined.

---

than the respondent, except for good cause shown.  Admin. Off. of the Cts., Admin. Directive #19-19, Guidelines for Extreme Risk Protective Orders 8(a) (Aug. 12, 2019) [hereinafter AOC Directive].

Officers also went to appellant's home and spoke to his wife. She confirmed the couple had an argument but said she did not feel unsafe. However, she told police appellant's comment about not caring if he was shot was "normal, or somewhat normal," for appellant to make.

Officer Licari searched police records and found police had previously received calls from people concerned about appellant's mental state. In December 2020, police received a call from a nurse concerned about appellant's wife's well-being, noting the home had "hoarding conditions" and the doors automatically locked and required standing on "a chair to reach the lock or latch on the front door" to exit. In 2019, appellant took his wife's cellphone during a domestic dispute.

In November 2014, New Jersey Transit Police contacted Saddle River Police because appellant, who worked on a New Jersey Transit train, said, "he would jump in front of a train" if his colleague did not stop the train to enable appellant to attend his daughter's doctor's appointment. At trial, appellant clarified that he meant his colleague's failure to stop the train to let appellant attend the appointment was the equivalent of being thrown in front of the train.

On March 19, 2014, a doctor at a local hospital contacted police, expressing concern about appellant because appellant told the doctor his stress

level over his wife's pregnancy "may[]be putting other people at risk." Officers responded to appellant's home, and he told them he was stressed because he was concerned about his wife's medical condition due to a difficult pregnancy.

After appellant left the police station on June 17, 2022, police had a second encounter with him, which led to his voluntary hospitalization. Around 7:00 p.m. that day, officers were dispatched to appellant's residence for a domestic incident. Appellant and his wife were arguing about school placement for their daughter. When police arrived, appellant's wife and daughter were on the front porch. The wife told police that appellant said "he was going to disappear to a place where nobody would be able to find him[,] and that it was a place only he knew about." According to the police report, when officers questioned appellant about this statement, he "refused to elaborate but told officers that they would be the ones to cause his funeral."

Appellant agreed to submit to a psychiatric screening. The evaluating doctor diagnosed him with adjustment disorder with depressive mood. The discharge instructions "highly recommended [appellant] start couples counseling" and for him "to start behavior health therapy . . . to set up [an] out-patient appointment for both psychiatric and behavior health services as soon as possible."

Although the doctor intended to release appellant, she recommended all firearms be removed beforehand. Appellant agreed to surrender his firearms, and officers removed seven firearms from the home and various types of ammunition, including an illegal gun magazine.

The municipal court granted Saddle River Police a TERPO based on these facts. In anticipation of the FERPO hearing, appellant consulted a forensic psychologist who prepared a report opining appellant was "psychiatrically stable and there are no notable concerns at this time with respect to his mental health." The psychologist found appellant was at "low risk[] of engaging in acts of self-injury or violence toward himself or others in the foreseeable future, with or without a firearm." The doctor noted he has never found a person to be at "no risk" and that his "low risk" finding regarding appellant was "one of the lowest possible risk levels [he] would set forth in these matters." (Emphasis in original). The doctor's report relied upon an interview with appellant, a collateral interview with appellant's wife, a review of the TERPO, the records of appellant's psychiatric hospitalization, and other documents.

The doctor opined appellant had "no history of engaging in behavioral problems" and no history of criminal arrest, "engaging in violence, domestic violence, aggression, property damage, fire-setting, animal cruelty, or similarly

5

problematic behaviors." According to the doctor, appellant denied saying he was going to "jump in front of a train" and claimed the accusation was "fabricated" by a coworker with whom he got into a verbal altercation. The doctor noted appellant acknowledged the 2019 domestic dispute where he took his wife's phone but provided no further information as to why.

The doctor administered the Personality Assessment Inventory (PAI) and the Minnesota Multiphasic Personality Inventory-3 (MMPI-3) tests to appellant. The PAI results were "invalid due to elevated PIM[2] scale, which corresponds to potential minimization." Notwithstanding the invalid PAI, the doctor stated he "reviewed critical items, and they did not reflect significant concerns." The doctor noted the MMPI-3 test results "also indicated potential defensiveness [by appellant]. However, there are no noteworthy scale elevations or the like."

Following the testimony, the judge made oral findings, entered a FERPO, and then issued a comprehensive written amplification pursuant to Rule 2:5-1(b). She found Officer Licari's testimony credible and appellant's testimony

---

2  PIM stands for Positive Impression Management and is a validity scale incorporated into the PAI, which aids the administrator in discriminating between "those who fake good from those who respond honestly and openly" to the questions in the PAI. Jason Peebles & Robert J. Moore, Detecting Socially Desirable Responding with the Personality Assessment Inventory: The Positive Impression Management Scale and the Defensiveness Index, 54 J. Clinical Psych., 621, 626 (1998).

partially credible. Appellant "was evasive and failed to answer all questions directly." He "also gave answers and explanations that contradicted various reports, including his own expert report." Appellant "repeatedly minimized the severity of his statements and behavior to the [c]ourt."

The judge gave the psychologist's report little weight because it was created in anticipation of the trial "and was based largely off of respondent's own self-reporting." Regardless, the report confirmed appellant "minimized the seriousness of his own issues and circumstances."

The judge found both the 2014 and 2019 incidents established appellant had "a history of threats or acts of violence against self or others." These incidents further showed he had a history of threatening to use physical force against another person. Although appellant voluntarily entered the hospital for psychiatric treatment, she concluded his overnight stay was involuntary. Moreover, the admission resulted in a psychiatric diagnosis of adjustment disorder with depressive mood. The judge further found the psychiatric admission was proof appellant received mental health treatment, but she noted he had not complied with the discharge recommendations for further outpatient treatment and instead consulted the expert to prepare a report for the trial. She concluded these factors preponderated in favor of entry of a FERPO.

7

I.

Appellant argues the trial judge erred when she found he had a history of threats of violence against himself or others, and that his statements to police in 2022 constituted threats of violence against himself or others. He claims the judge took the statements out of context because they were an expression of the emotional pain he would experience if he were arrested, as he would not be able to provide for his wife and daughter. Moreover, he never acted on his statements, none of the reports in evidence said he was a danger to himself or others, and his contacts with police were for the purpose of peaceably resolving marital disputes. Appellant notes he has never: been subject to a restraining order, an order of protection, a TERPO, or arrested; committed animal cruelty; or had a history of substance abuse. And he has not recently acquired a firearm or other deadly weapon. Nor has he ever recklessly used, displayed, or brandished a firearm.

Appellant argues the trial judge's finding he was involuntarily committed to a psychiatric facility was erroneous.[3] Moreover, the judge ignored the fact appellant's psychologist concluded he did not pose a significant risk to himself or others by possessing firearms. Thus, he asserts the State failed to show a

---

[3] The State concedes this finding was erroneous.

logical nexus between his mental health diagnosis and a significant risk of harm to himself or others if he possessed firearms.

Appellant also challenges the court's ruling on Second Amendment grounds. He claims the judge never made findings on how the Act and the restrictions on gun ownership that flow from the entry of a FERPO are consistent with "the nation's historical traditions of firearm regulation." He argues the Act is unconstitutional.

"The scope of appellate review of a trial court's fact-finding function is limited. The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We do "not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced . . . they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Id. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

We previously outlined the law that frames our discussion of appellant's arguments at length in In re D.L.B., 468 N.J. Super. 397, 400-07 (App. Div. 2021). We explained the Act is modeled on the process for obtaining a domestic violence restraining order. Id. at 402. The Act contains eight statutory factors

under N.J.S.A. 2C:58-23(f), and seven additional factors were promulgated in the AOC Directive, which courts must consider before entering a FERPO. Id. at 402-04. We also described the applicable evidentiary standards, including that the Act provides "[t]he court shall issue the FERPO . . . if it finds 'by a preponderance of the evidence at the hearing that the respondent poses a significant danger of bodily injury to the respondent's self or others' by possessing a firearm." Id. at 406-07 (quoting N.J.S.A. 2C:58-24(b)).

Pursuant to these principles, we affirm substantially for the reasons expressed in the trial judge's oral and written opinions. We add the following comments.

The record supports the trial judge's findings appellant made multiple suicidal statements on June 17, 2022, when he said he did not care if police officers shot him, wondered why anyone would want to live "on this earth," and that "he was going to disappear to a place where nobody would be able to find him[,] and that it was a place only he knew about." Most concerning was appellant's statement to police officers that they would be the ones to cause his funeral. Additionally, his wife told officers it was normal or somewhat normal for appellant to make suicidal statements. These alarming statements went

beyond appellant's purported attempt to resolve mere marital contretemps by enlisting police assistance.

Appellant's behavioral history was no less concerning. Regardless of how he made or intended his comments to his coworker in 2014, appellant's conduct caused enough concern that Transit Police contacted Saddle River Police. That same year, appellant's comments at a doctor's visit impelled the doctor to also contact police with concerns appellant might harm himself or others because of his emotional state. And the 2019 incident, which resulted in police responding to appellant's home because he argued with his wife and then took her phone, bore semblance to domestic violence, namely, the desire of one party to control the other. See Corrente v. Corrente, 281 N.J. Super. 243, 246 (App. Div. 1995) (explaining domestic violence "describes a pattern of abusive and controlling behavior which injures its victim").

Therefore, the trial judge correctly found both the 2022 predicate acts and appellant's history in 2014 and 2019 met N.J.S.A. 2C:58-23(f)(1) and (2). Indeed, those factors require the court to "consider whether the respondent: (1) has any history of threats or acts of violence by the respondent directed toward self or others; (2) has any history of use, attempted use, or threatened use of

11

physical force by the respondent against another person."  N.J.S.A. 2C:58-23(f)(1)-(2).

Although the judge mistakenly found appellant had been involuntarily admitted, her finding pursuant to the factors under AOC Directive Guideline 3(d)(13)-(15) is also amply supported by the record.  Those factors require the court to consider whether a respondent "has received or is receiving mental health treatment; . . . has complied or has failed to comply with any mental health treatment; and . . . has received a diagnosis of a mental health disorder."  AOC Directive Guideline 3(d)(13)-(15).

For these reasons, we conclude the judge neither abused her discretion nor misapplied the law when she granted the FERPO.  Finally, we decline to consider appellant's constitutional challenge to the Act.  This issue was not properly raised before the trial judge, and we decline to consider it for the first time on appeal.  Selective Ins. Co. of Am. v. Rothman, 208 N.J. 580, 586 (2012); Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2416-22