# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2317-19

F.C.,[1]

    Plaintiff-Respondent,

v.

F.C., Jr.,

    Defendant-Appellant.

_____

Submitted October 12, 2021 – Decided December 3, 2021

Before Judges Accurso and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-1127-20.

Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the briefs).

Cohn Lifland Pearlman Herrmann & Knopf, LLP, attorneys for respondent (Amanda S. Trigg, of counsel and on the brief; Julie L. Kim and Christina N. Stripp, on the brief).

---

[1] We use initials to protect the plaintiff's confidentiality. R. 1:38-3(c)(12).

PER CURIAM

Defendant F.C., Jr., appeals from a January 7, 2020 final restraining order (FRO) issued in favor of his estranged wife, plaintiff F.C., based on the predicate acts of harassment, N.J.S.A. 2C:33-4(a) or (c), and 2C:25-19(a)(13); and criminal trespass, N.J.S.A. 2C:18-3(c), and 2C:25-19(a)(12). Defendant contends his voluminous text messages were not sent with the purpose of harassing plaintiff, and the judge erroneously found defendant's violation of the parties' matrimonial order established a violation of the criminal trespass statute. He further claims plaintiff failed to establish she needs final restraints to protect her from immediate danger or further abuse by defendant, arguing the disputes between the parties constituted marital contretemps. Having considered defendant's contentions in view of the record and the governing law, we affirm the grant of the FRO based on the predicate act of harassment.

I.

The facts were established at the three-day bench trial in January 2020. Represented by counsel, plaintiff testified on her own behalf and introduced in evidence several exhibits, including text messages between the parties. Defendant was self-represented. He testified on his own behalf and presented the testimony of his Alcoholics Anonymous (AA) sponsor.

At the time of trial, the parties had been married for eight years and were engaged in contentious divorce litigation, primarily concerning defendant's parenting time with the couple's three minor children, ages eight, six, and five. Plaintiff recounted a history of domestic abuse that led to civil restraints.

On June 21, 2019, the parties separated following a domestic violence incident that occurred in the early morning hours during an argument about their impending divorce. Accusing plaintiff of planning an affair during her upcoming business trip, defendant punched a wall in their bedroom with such force that a mirror dislodged. Defendant then threw the mirror in plaintiff's direction. Plaintiff filed a domestic violence complaint, reporting the incident and alleging prior acts of domestic violence. Plaintiff claimed defendant was an alcoholic, who became physically and mentally abusive when intoxicated and threatened suicide if plaintiff were to leave him. Plaintiff was issued a temporary restraining order (TRO) on the same day.

On July 18, 2019, represented by their respective attorneys, the parties agreed to the terms of a civil consent order that: dissolved the TRO; imposed civil restraints; awarded primary residential custody to plaintiff; and required the parties to attend family therapy sessions. Pursuant to the order, defendant was civilly restrained from all forms of "contact or communication with

[p]laintiff, except for non-harassing electronic communication" through the Our Family Wizard (OFW) application concerning the children. Both parties were prohibited from "appear[ing] at the other's place of residence and/or employment."

Apparently, the spirit of compromise reflected in the consent order was short lived. Less than one month later, on August 14, 2019, defendant sent plaintiff a text message, stating: "When we get back [to court,] there will be many motions to enforce, including how you are not letting me talk to the kids regularly. So go ahead and send this over to [your attorney]."

The frequency of defendant's text messaging escalated in November and December 2019, when defendant sent plaintiff multiple messages: inquiring whether plaintiff was dating; berating her; and asking whether she still loved him. Many of the messages contained profanity. As a few notable examples, defendant sent nine messages on November 8, 2019, including: (1) "Do you love me? I know you can't accept it all and that but do you love me still? You're so nice like a sweetie even when I'm mean"; (2) "How can you live with yourself"; (3) "You're a terrible person, at least I'm changing for the better"; and (4) "You're insane." Attempting to diffuse defendant's anger, plaintiff responded to some of defendant's messages to no avail.

A-2317-19

The events that precipitated the filing of the present domestic violence complaint began when defendant began texting plaintiff around 2:00 p.m. on Monday, December 16, 2019, while plaintiff was at work. Expressing his displeasure about the parties' parenting time arrangement, defendant repeatedly asked plaintiff to consider fifty-fifty parenting time. Defendant sent plaintiff twenty-two messages in one hour, hurling a steady "stream" of threats and insults including: "You have no empathy[]"; and "You fucking bitch." Defendant also referenced his previous threat that he would "burn[] down the house."

A few hours later, defendant sent plaintiff a message asking to see the children that night. Rejecting his request, plaintiff responded that defendant should send messages about parenting time through OFW. Plaintiff then sent a message via OFW, stating he was out of control and, as such, she blocked his cellphone number. Defendant responded: "It's out of control to demand a relationship with my children. Then call me a lunatic ma'am. Yes. Call me crazy. I hereby request, nay, I demand for my rights to be heard. You ma'am are out of line." Plaintiff testified she felt "frustrated, sad, and scared" after receiving this message because it seemed strange that defendant referred to her as, "ma'am." She said the overall tone of the message did not "sound right."

A-2317-19

Ten minutes after receiving those messages, defendant appeared at the marital home unannounced and uninvited. The Ring doorbell's camera captured video and audio depicting defendant walking up to the door, standing on the porch, ringing the doorbell, and peering through the door's stained-glass window. Plaintiff testified she did not open the door because she was afraid. Defendant remained at the door for about fifteen minutes. Plaintiff denied his demands to take home one of the three children.

During the ensuing argument, the parties' oldest child called the police. Defendant told the responding officers he was not certain whether he was permitted to be present at the home. Plaintiff told police the parties had signed a consent order, permitting defendant to see the children only on Saturdays. Defendant claimed there was no such agreement, but left the home when police told him he should do so. Defendant's AA sponsor, who arrived at the home while police were present, confirmed defendant's account.

The next day, on December 17, 2019, plaintiff filed the present domestic violence complaint against defendant, alleging harassment, cyber-harassment,

and criminal trespass, and prior acts of domestic violence. A Family Part judge issued a TRO that day.[2]

At trial, defendant claimed his text messages were never intended to harass plaintiff. Rather, his "primary objective" was "to communicate with her to effect a positive outcome for the children." According to defendant:

> Sometimes messages were along the lines of reconciliation, but if they were it was because I thought at the time it could be possible and best for the children. Sometimes the messages contained explicit language, but I never started conversations with the intention of harassing her. Distasteful language was always sent quickly without thinking and it was usually followed by an apology. Sometimes I solicited personal and intimate information, but these requests were not without basis as we had previously discussed the possibility of being able to share details of intimate relations . . . [when the other party had started] a serious relationship [with someone else].

Defendant acknowledged he looked through "tinted glass of some kind to see into the front hallway of the house." He said he saw his son; they smiled; and defendant "waved at him."

At the conclusion of testimony, the trial judge found defendant harassed plaintiff and invaded her privacy within the meaning of the criminal trespass

---

[2] The TRO was amended three days later to provide defendant parenting time with the children.

A-2317-19

statute.[3] The judge found plaintiff credible, explaining her testimony rang true and she was unflustered on cross-examination. Noting plaintiff appeared frightened during her testimony, even "shaking at times," the judge credited plaintiff's claims that she was afraid of defendant. The judge therefore concluded the events that underscored plaintiff's present domestic violence complaint, and the history of domestic violence, occurred as she described them.

Conversely, the judge found defendant not believable, noting his account was not supported by the record evidence. For example, the judge cited defendant's conversation with the responding officers, wherein defendant denied the existence of the consent order. Although the judge acknowledged defendant was, in part, motivated by a desire to have a relationship with his children, he concluded defendant's actions were "more than domestic contretemps."

## II.

## A.

Our limited scope of review of a trial court's findings of fact is well established. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[W]e grant

---

[3] Finding defendant neither threatened plaintiff with injury nor sent her any "lewd, indecent, or obscene materials," the judge declined to find defendant committed the predicate act of cyber-harassment. See N.J.S.A. 2C:33-4.1, and 2C:25-19(a)(19).

substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We will not disturb the court's factual findings and legal conclusions "unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (internal quotation marks omitted).

Deference is particularly appropriate here, where the evidence is largely testimonial and hinges upon a court's ability to make assessments of credibility. Ibid. It is axiomatic that the judge who observes the witnesses and hears the testimony has a perspective the reviewing court simply does not enjoy. See Pascale v. Pascale, 113 N.J. 20, 33 (1988). We also accord deference to the factual findings of Family Part judges because that court has "special jurisdiction and expertise in family matters . . . ." Cesare, 154 N.J. at 413. Conversely, a trial judge's decision on a purely legal issue is subject to de novo review on appeal. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007).

The entry of an FRO under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver v. Silver, 387 N.J. Super. 112, 125-

27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402).

Secondly, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011) (noting the importance of the second Silver prong). Those factors include – but are not limited to – "[t]he previous history of domestic violence between the [parties], including threats, harassment and physical abuse," N.J.S.A. 2C:25-29(a)(1), and "[t]he existence of immediate danger to person or property." N.J.S.A. 2C:25-29(a)(2).

Pertinent to this appeal, a person is guilty of harassment "if, with purpose to harass another," the person:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm; [or]

. . . .

> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [(N.J.S.A. 2C:33-4(a) and (c)).]

In the present matter, the trial judge concluded defendant violated subsections (a) and (c) of the harassment statute both by the frequency and content of his repeated text messages, sent over twelve days in November and December. In reaching his decision, the judge described the prior domestic violence history between the parties, noting the escalating text messages sent by defendant evinced "a very controlling individual," who had no regard for the parties' consent order. See State v. J.T., 294 N.J. Super. 540, 544-45 (App. Div. 1996) (affirming trial court's finding of harassment where a defendant sat outside the victim's home in her sight, ignoring a prior court order prohibiting contact with the victim).

In his counseled merits brief on appeal, defendant maintains his purpose was not to harass plaintiff, but rather his text messages were sent in an effort to communicate with plaintiff about his parenting time. Defendant further claims his conduct did not constitute harassment under the statute. Defendant's arguments are unavailing.

11

Initially, we acknowledge that the precipitating events leading up to the domestic violence complaint in this case arose contemporaneously with the parties' divorce action. In similar circumstances, we have cautioned:

> [t]he Act is intended to assist those who are truly the victims of domestic violence. It should not be trivialized by its misuse in situations which do not involve violence or threats of violence. In addition, we have previously expressed our concern that the Act may be misused in order to gain advantage in a companion matrimonial action or custody or visitation action.
>
> [Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999).]

More recently, we have observed a violation of a civil restraining order is not a violation of the Act, although it can provide important context supporting a finding of intent to commit one of the enumerated acts in the statute. See N.B. v. S.K., 435 N.J. Super. 298, 307-08 (App. Div. 2014).

In the present matter, the trial judge considered the extensive testimony adduced at the domestic violence trial and fully assessed the credibility of the parties. Defendant's text messages violated the civil restraints; under the totality of the circumstances, in view of the domestic violence history recognized by the judge, the frequency, volume, and crude content of those messages support a finding of harassment. See N.B., 435 N.J. Super. at 307; see also State v. Hoffman, 149 N.J. 564, 577 (1997) (recognizing defendant's "purpose to harass

A-2317-19

may be inferred from the evidence presented"); Pazienza v. Camarate, 381 N.J. Super. 173, 183-84 (App. Div. 2005).

We therefore conclude the judge's determination that defendant engaged in harassment under both subsections (a) and (c) was fully supported by the trial record. Given our deferential standard of review, we discern no basis to disturb that finding. As only one predicate act is required to find domestic violence, see Silver, 387 N.J. Super. at 125, we need not address whether defendant's conduct also constituted criminal trespass here, where the judge found defendant's conduct alleged on December 16, 2019 constituted both predicate acts.

## B.

Nor do we find any merit to defendant's contentions that plaintiff failed to demonstrate the need for an FRO. Defendant asserts the parties' prior conduct merely constituted "ordinary domestic contretemps." We are unpersuaded.

The domestic violence history recounted by the judge – combined with his specific findings regarding defendant's multiple offensive text messages, which violated the consent order – distinguishes this case from those upon which defendant relies to argue that the evidence supported only a finding of marital contretemps. Cf. Corrente v. Corrente¸ 281 N.J. Super. 243, 249-50 (App. Div. 1995) (finding no harassment where after the parties argued, the defendant shut

off the plaintiff's phone service); Peranio v. Peranio, 280 N.J. Super. 47, 55-57 (App. Div. 1995) (finding no harassment where the defendant said to the plaintiff, "I'll bury you"); Murray v. Murray, 267 N.J. Super. 406, 410-11 (App. Div. 1993) (finding no harassment where, in the midst of a divorce, the defendant told the plaintiff on several occasions that he was leaving her, and no longer felt emotional or physical attraction to her). In those cases – unlike the present matter – the plaintiff did not allege a prior domestic violence history. See Corrente, 281 N.J. Super. at 250; Peranio, 280 N.J. Super. at 56; Murray, 267 N.J. Super. at 408.

Unlike cases where we have found conduct to constitute "ordinary domestic contretemps," we do not find defendant's prior conduct simply to be "rude" behavior the Legislature did not intend to criminalize. See J.D., 207 N.J. at 483; see also Corrente, 281 N.J. Super. at 250. That conduct was evidenced by the plethora and frequency of text messages – often while plaintiff was at work – with demands about their parenting time arrangement; accusations of her promiscuity and of alienating him from the children; and name-calling. And that conduct constituted a "pattern of abusive and controlling behavior," which is a "classic characteristic of domestic violence." Silver, 387 N.J. Super. at 128.

In summary, the trial judge evaluated plaintiff's testimony and the evidence admitted at trial, finding the evidence sufficient to satisfy both prongs of the Silver analysis. Given our deferential standard of review, we find no basis to disturb that determination.

To the extent not specifically addressed, defendant's remaining contentions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2317-19